In re Barbara J. KIRK, Debtor.

Barbara J. KIRK, Plaintiff,

v.

UNITED STATES of America, DEPARTMENT of INTERNAL REVENUE, Defendant.

Bankruptcy No. 87–645–ORL–6P7.
Adv. No. 87–130.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Jan. 25, 1989.

R. Edward Cooley, Longwood, Fla., for plaintiff.

Clinton W. Marrs, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

THOMAS E. BAYNES, Jr.,
Bankruptcy Judge.

THE MATTER before this Court is a Complaint filed by the Debtor, Barbara J. Kirk, to Determine the Dischargeability of a Debt pursuant to Section 523(a)(1)(C) and Section 523(a)(7)(A) of the Bankruptcy Code. The Court reviewed the record and the evidence presented at trial, heard argument of counsel, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

On March 18, 1987, the Debtor, a divorced woman and mother of three children, filed her Chapter 7 Petition in the U.S. Bankruptcy Court, Orlando, Florida, and was subsequently discharged on July 13, 1987. At the time of filing she was clearly insolvent with liabilities in excess of $1.2 million dollars and assets worth only $3,990.00. The Internal Revenue was owed ninety-three percent (93%) of the debt, or $1,189,138.95, based upon a jeopardy assessment made against the Debtor and her husband for the tax years 1977 and 1978 for failing to report income from the sale of illegal drugs. The Debtor listed the debt on her schedules and on May 7, 1987, filed a Complaint against the Internal Revenue Service (IRS) to determine the dischargeability of the tax debt.

The record discloses the Debtor and her husband, Joe Kirk, were married in 1975, but divorced sometime prior to the filing of her petition. As do many married couples, the Kirks filed joint tax returns in 1975 and for all periods relevant to this case. The returns were prepared by H & R Block in 1975 and 1976, and by a certified public accountant in 1977 and 1978. The relevant contents of the tax returns are presented below:

TAX YEARS AND RELATED INCOME

| | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|
| JOSEPH | *Physicist | Student | Self-employed | Self-empl. |
| BARBARA | *Secretary | Housewife | Housewife | Housewife |
| Income from: | | | | |
| WAGES | $6,581.00 | $2,600.00 | –0– | –0– |
| INTEREST | –0– | –0– | –0– | $ 276.00 |
| CAPITAL GAIN | –0– | –0– | $20,600.00 | 34,557.00 |
| PARTNERSHIP | –0– | –0– | $19,549.00 | 1,691.00 |
| FARM | –0– | –0– | –0– | 1,346.00 |
| ADJUSTED GROSS INCOME | $6,092.00 | $2,600.00 | $40,149.00 | $37,870.00 |
| ITEMIZED DE-DUCTION | –0– | –0– | –0– | –0– |
| TAXABLE IN-COME | $6,092.00 | $2,600.00 | $40,149.00 | $37,870.00 |

* Occupation

In the first two years of marriage, the couple's income from wages and other sources of $6,581.00 in 1977 and $2,600.00 in 1978 suggested an extremely modest lifestyle. In 1977 the couple's income climbed to $60,749.00 and to $69,827.00 in 1978, yielding taxable income of $40,149.00 and $37,870.00 respectively. Surprisingly, the bulk of the income generated in those later years resulted from the sale of rare coins held by the couple. The sale, classified as a capital gain, netted $41,200.00 in 1977 and $66,514.00 in 1978. Comparatively, income from self-employment generated only thirty percent of the 1977 income and less than one percent of the income in 1978. The thirty percent or $19,540.00 came solely from K & E Charters, a partnership reported on the return. The profit from farm operations totalling $1,346.00 was the only source of self-employment income listed on the tax return for 1978. There were no wages reported by either spouse nor were any itemized deductions taken during the 1977 and 1978 tax years. The only income attributed solely to the Debtor during the tax periods 1975 through 1978 were wages earned during the 1975 tax period as a bank employee.

The 1977 and 1978 returns were eventually challenged by the IRS. According to the IRS, on August 12, 1982, a jeopardy assessment was made against the Debtor and Joe Kirk as follows:

Fraud Penalty

| Year | Tax | 50% Civil | Interest |
|---|---|---|---|
| 1977 | $352,831.00 | $176,416.00 | $160,083.78 |
| 1978 | 179,497.00 | 89,748.00 | 70,670.18 |
| Total | $532,328.00 | $266,164.00 | $230,753.96 |

Total tax, interest and penalties = $1,029,245.96

Joe Kirk was subsequently convicted on two counts of tax evasion for the tax years 1977 and 1978 for failing to report income generated from the sale of illegal drugs. He was incarcerated for the crime but the record contains no evidence criminal charges on those matters were brought against the Debtor. Her tax problems appear to be limited to the joint obligation associated with the jeopardy assessment pursuant to 26 U.S.C. § 6861, and juxtaposed with the issue of dischargeability of the debt pursuant to 11 U.S.C. § 523.

This Court is faced with the question of dischargeability coupled with the accusation of tax fraud involving unreported income from illegal drug activity. Here, also, is a situation where the Debtor's ex-spouse was found guilty of tax fraud for the relevant years prior to the filing of the bankruptcy petition by the Debtor. The IRS now contends the Debtor's obligation as to the tax debt is nondischargeable pursuant to Section 523(a)(1)(C) and (a)(7) of the Bankruptcy Code. Section 523(a)(1)(C) excepts from discharge any debt associated with the making of a fraudulent income tax

return or any willful attempt to evade or defeat the tax. Similarly Section 523(a)(7) excepts from discharge any tax and related penalties associated with a fraudulent return.

The foundation of the IRS argument is Internal Revenue Code Section 6013 which permits a husband and wife to make a single return jointly of income taxes. 26 U.S.C. § 6013(a). When a joint return is made, the tax is computed on the aggregate income of the couple and the liability with respect to the tax is joint and several. 26 U.S.C. § 6013(d)(3). If there is an underpayment of tax and any part of the underpayment is due to fraud, there is added to the tax a civil fraud penalty in an amount equal to fifty percent of the tax underpaid. 26 U.S.C. § 6653(b) (Internal Revenue Code of 1954).

The Debtor contends she is an innocent spouse and is subject to relief from the tax including interest, penalties and other amounts pursuant to the innocent spouse provision of Section 6013(e)(1) of the Internal Revenue Code. The innocent spouse provision was a Congressional response to the hardship caused by the joint and several liability of 26 U.S.C. § 6013(d)(3) on a spouse who innocently filed a joint return where income was substantially understated due to the fault of the other spouse. *See Sonnenborn v. Commissioner*, 57 T.C. 373 (1971); 26 U.S.C. § 6013(e). While joint and several liability under Section 6013(d)(3) remains the general rule, by strictly complying with the conditions set forth in Section 6013(e) the innocent spouse could be relieved of the tax obligation. *Sonnenborn*, supra.

At first glance, 26 U.S.C. § 6013(e) of the Internal Revenue Code (innocent spouse provision) appears applicable here, but it is not. The issue before this Court is a determination of dischargeability of a debt pursuant to 11 U.S.C. § 523 and not a determination of tax liability pursuant to 11 U.S.C. § 505. The underlying focus, the standard upon which the Court makes its determination, and the burden of proof is different for these sections.

■ Were the issue before this Court a tax liability determination pursuant to 11 U.S.C. § 505, the focus would be on the extent, if any, of the underlying liability of the Debtor. It is well settled a tax assessment is presumptively correct. *Sullivan v. C.I.R.*, 27 T.C. 306 (1956), *aff'd*, 256 F.2d 4 (5th Cir.1958). Internal Revenue Code Section 6013(d)(3) states the general rule that a spouse who filed a joint return where the tax is substantially understated is liable for the tax, interest and penalties assessed. 26 U.S.C. § 6013(d)(3). In line with the spirit and intent of the innocent spouse provision, the spouse could challenge the presumption of correctness of the assessment by proving (s)he did not know or have reason to know of the substantial understatement. 26 U.S.C. § 6013(e). The burden of proof pursuant to Section 6013(e) would be on the innocent spouse, *Sanders v. U.S.*, 509 F.2d 162, 170 (5th Cir.1975), to prove this fact by a preponderance of evidence.

■ Conversely, the matter before this Court, a Section 523 dischargeability determination, focuses on whether or not the tax debt is dischargeable in bankruptcy. Dischargeability is the primary issue. Here, the IRS argues the tax debt is nondischargeable pursuant to Section 523(a)(1)(C) and Section 523(a)(7)(A) based upon the filing of a fraudulent return by the Debtor. As fraud is the issue, the Court is guided by Section 6653(b) of the Internal Revenue Code which addresses the issue of civil fraud. Section 6653(b)(3) provides that a spouse is not liable for the civil fraud penalty when a joint return is filed unless some part of the underpayment is due to the fraud of that spouse. 26 U.S.C. § 6653(b)(3). As such, there is no presumption of correctness of the fraud penalty. *Goldberg v. C.I.R.*, 239 F.2d 316, 320 (5th Cir.1956). The fraudulent activity of the Debtor's spouse cannot be imputed to her, *Toussaint v. C.I.R.*, 743 F.2d 309, 312 (5th Cir.1984), despite his concession of the fraud, *Sullivan, supra*. Consequently, the IRS must prove an actual, intentional wrongdoing by the Debtor. The intent required is the specific purpose to evade a tax believed to be owing. *Carter v. Campbell*, 264 F.2d 930 (5th Cir.1959). As a general rule, the burden of proof is normally on the movant (Debtor). On the issue of

fraud, however, the burden of proof is on the IRS. *Stoltzfus v. U.S.*, 398 F.2d 1002, 1005 (1968), *cert. denied*, 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969). In the present case, the IRS affirmatively acknowledged that burden. Finally, the standard to be applied in reaching a determination on the fraud issue is something impressively more than a slight preponderance of the evidence. *Cirillo v. C.I.R.*, 314 F.2d 478 (3rd Cir.1963). Fraud must be proven by clear and convincing evidence (*Toledano v. C.I.R.*, 362 F.2d 243, 247 (5th Cir.1966), for each tax year in question. *Wilson v. C.I.R.*, 76 T.C. 623 (1981).

■ The facts and circumstances required to prove fraud pursuant to Section 523(a)(1)(A) of the Bankruptcy Code are the same as those necessary in imposing the fraud penalty pursuant to the Internal Revenue Code. *In re Harris*, 49 B.R. 223, 226 (Bankr.W.D.Va.1985). The IRS must establish (1) knowledge of the falsehood of the return; (2) an intent to evade the taxes; and, (3) an underpayment of the tax. *Considine v. U.S.*, 645 F.2d 925, 929 (1981), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). Joe Kirk's conviction clearly established the return was fraudulent and the taxes underpaid. The only question before this Court is whether the IRS provided clear and convincing evidence the Debtor possessed knowledge of the returns' falsity and whether she intended to evade the taxes.

■ The existence of fraud is a question of fact to be determined upon consideration of the entire record. *Stratton v. C.I.R.*, 54 T.C. 255, 282 (1970). Its proof is rarely established through direct proof of intention to evade taxes *Stone v. C.I.R.*, 56 T.C. 213 (1971). It may depend to some extent upon circumstantial evidence. *Toussaint* at 312. It can also be gleaned by surveying the whole course of conduct of the Debtor, *Stone* at 224; *Patton v. C.I.R.*, 799 F.2d 166 (5th Cir.1986); *Goldberg* at 317, and may rest upon reasonable inferences properly drawn from such conduct or the evidence of record. *Stone* at 224.

■ Along these lines, the IRS makes two basic arguments and proffered evidence to support its contention that the Debtor filed a fraudulent return. First, the IRS argued the Debtor actively participated with her husband in the illegal activity. In support of this contention they proffered the testimony of a witness who alleges first hand knowledge of the Debtor's participation. By virtue of the Debtor's direct participation with her ex-spouse in the illegal drug activity, the IRS argues the Debtor had both the knowledge of the illegal activity as well as the intent to evade the taxes. The IRS' second argument centers around the Debtor's conduct and the couple's lifestyle which the IRS contends, taken as a whole, was indicative of the Debtor's knowledge of and intent to evade taxes.

In support of their first contention, the IRS presented Mr. Anderson, a veteran attorney who purported to be a family friend and business advisor of the Kirks. At the time of the hearing Mr. Anderson was incarcerated in federal prison for distributing cocaine. Prior to his incarceration, he and the Debtor's ex-spouse were confederates in the drug trafficking activity which both parties admitted included large volumes of marijuana and to a lesser degree, cocaine.

Throughout his testimony the witness described in detail alleged transactions involving the exchange of cocaine and drug money between the Debtor and him in the Debtor's home during 1977 and 1978. According to the witness, he frequently delivered to the Kirks' home one to two kilos of cocaine, conspicuously wrapped in newspaper and transported in a paper bag. The packages of cocaine were often sampled and then exchanged for the drug money, which averaged $55,000.00 per transaction. The drug money was occasionally counted in the Debtor's presence until it became evident the Debtor could be trusted to deliver the property intact to her husband, who was frequently away from home. Moreover, according to the witness, he and the Debtor specifically discussed the need to cautiously spend the drug money and of the legal and tax consequences to her if the illegal activity was uncovered.

The IRS also elicited testimony from the Debtor and her ex-husband which the IRS contends supplied further proof of the

Debtor's participation in the illegal activity. The Debtor testified she worked for several banks during the period 1971 through 1976 and was familiar with counterfeit currency. In 1977, at her husband's request, the Debtor admittedly participated in screening a large volume of cash, approximating $500,000.00 to $1,000,000.00 in her home. The money was brought there by wealthy business associates of her husband and consisted of $100 bills housed in a briefcase. Over several hours the group screened the cash looking for counterfeit bills. Her ex-husband testified the money was drug-related but denies his wife was aware of this fact. The IRS contends that the Debtor was indeed aware of the source of the money at the time it was screened, pointing to the suspicious circumstances surrounding the screening.

Next, the IRS pointed to the couple's champagne purse and root beer pocketbook which could not possibly justify the upward swing in the couple's standard of living. The IRS observed that in 1975 and 1976, the couple's gross income was less than $10,000.00. In 1977, they resided in an apartment. By 1978, however, the couple had purchased a 52–acre ranch and built a custom, two-story, four-bedroom home with a detached brick garage. The Debtor drove the latest model cars; a 1977 and 1978 Cadillac Coup de Ville. Her husband drove a 1978 Corvette and a $56,000.00 1978 Rolls Royce Silver Shadow on which a $10,000.00 cash down payment was made. The family also owned a four-wheel drive truck.

Their prosperity was cloaked in a facade of legality, however. The Debtor's ex-spouse testified he was known in the community as Dr. Kirk, although the Ph.D he possessed was earned through a correspondence course. This facade was further evidenced by the couple's activity in and generosity to their church. The IRS presented copies of church receipts which showed a $21,000.00 contribution in 1977 and a $12,-000.00 contribution in 1978. The receipts were addressed to "Barbara or Joe Kirk."

The IRS presented evidence of disparities in the standard of living and income reported on the tax return. In April, 1977, March, 1978, and November, 1978, the Debtor and her ex-spouse jointly signed credit applications which identified her husband as president or chairman of the board of Harris Jet Charter Co. Her husband's income was listed as $40,000.00 on the 1977 application; as $150,000.00 on the March, 1978 application; and as $200,000.00 on the November, 1978 application. His salary is clearly identified as the couple's only source of income. In comparison, the taxable income per the income tax returns was $2,600.00 in 1976; $40,149.00 in 1977; and $37,870.00 in 1978. The IRS argues the Debtor was aware the couple had unreported income since she signed the credit applications which clearly reflected income substantially greater than that indicated on the tax returns.

The IRS presented evidence that in 1974 the Debtor and Joe Kirk were charged by the state of New Jersey with a drug-related felony involving the manufacture of a controlled substance. The Debtor admitted she pled guilty to the felony and paid a $2,500.00 fine but contends she was innocent of the crime. She alleges upon visiting her husband in New Jersey, she only then learned of his association with illegal drugs. As fate would have it, she was present when he and several other persons were arrested for manufacturing the chemical controlled substance. Joe Kirk directed her to enter a plea of guilty as a part of a plea bargaining arrangement and she acquiesed.

Clearly, a straight, solid line can be drawn between the evidence presented by the IRS against the Debtor and to her ex-spouse's efforts to defraud the government of taxes due. But was the Debtor actually aware of the unreported income derived from the sale of illegal drugs? She contends she was not.

First, the Debtor denies ever meeting the witness, Anderson, until 1982 when her ex-spouse assisted the IRS in an effort to arrest and convict several of his compatriots, including Mr. Anderson, on illegal drug charges. The Debtor further contends the witness' testimony was self serving and simply an attempt to get even with her ex-spouse. To support the allegation that

the witness' testimony was tainted, the Debtor presented testimony from an observer who was in the courthouse corridor at the time Mr. Anderson was escorted from the courtroom. According to the observer, the witness mouthed certain expletives to the Debtor's ex-spouse as they passed in the courthouse corridor.[1]

The Debtor also contends there were inconsistencies in Mr. Anderson's testimony concerning the time and place of the alleged transactions. For example, according to the Debtor, the witness made reference to illegal transactions with the Debtor, (1) in a house that was not yet built and (2) to children not yet born at the time of the alleged transactions between the witness and the Debtor.

As to the counterfeit money, the Debtor concedes to screening the cash brought to her home by her husband's business associates but contends she was unaware the money was drug related. According to the Debtor, her husband requested she assist in screening the money. As these were his wealthy business associates, it did not appear suspicious to her they would have such amounts of cash literally on hand.

The Debtor further contends the upward swing in the couple's lifestyle was due to her husband's employment with Harris Jet Company, a company she believed actually existed. She testified she and her son often visited Fort Lauderdale where Harris Jet Company was allegedly located and had called her husband at the company on occasions. She did not contend she ever visted the company, however.

While not admitting to knowledge of unreported income or of the magnitude of church contributions, she does admit she knew their Webster home was mortgage free. The Debtor contends she signed the credit applications and the tax returns at her husband's directions but was not aware of their contents or the amount of her husband's income.

After a review of the testimony and the record for the 1977 and 1978 tax years against the burden of proof required in this case, the Court finds that the evidence is not clear and convincing the Debtor filed a fraudulent return for the 1977 tax year, but it is clear and convincing she did file a fraudulent return for the 1978 tax year.

As to the 1977 tax year, the Court finds the evidence is lacking in its persuasiveness and the IRS has not met its very heavy burden of proof.

While the Court does not discredit the witness Anderson's, entire testimony, it is troubled by inconsistencies in his story as to the point in time the alleged transactions between him and the Debtor occurred, but only as to 1977. As the Debtor correctly observed, the witness mentioned visits to the Webster home throughout his testimony. In fact, the witness stated he first met the Debtor there. The couple did not move into their custom built Webster home until the summer of 1978. While ten years and innumerable lines of cocaine may blur the witness' memory, this Court finds his testimony clearly establishes the earliest point in time in which the transaction between the witness and the Debtor could have occurred would have been in 1978. The Court places little weight on the inconsistencies in the witness' testimony regarding the children he observed.

Notwithstanding the IRS' contention to the contrary regarding the credit applications, the Court also finds a lack of persuasive evidence to support the position that the Debtor was aware of unreported income in 1977 based upon disparagies in the amount of income reported on the tax return and the amount stated on the credit application. There is a sufficient nexus between the $40,149.00 income per the March 1977 credit application, and the $40,000.00 taxable income per the 1977 tax return. The evidence speaks for itself.

[1] The Court granted a motion to hear additional testimony on this matter. To rebut the observer's testimony, the IRS presented the testimony of the U.S. Marshal who escorted Mr. Anderson from the courtroom. According to the U.S. Marshal, after Mr. Anderson left the witness stand, he and Mr. Anderson conversed the entire time they walked through the corridor. The U.S. Marshal, who would have been in a position to observe any exchanges between the Debtor's ex-spouse and Mr. Anderson, testified he observed none. Another officer assisting the U.S. Marshal saw nothing which would suggest the expletive being mouthed but not spoken. Considering the nature of the expletive, it appears quite unnatural no response was seen by the Marshals if the statement was actually mouthed.

The coin sale, the propriety of which was never disputed, netted $41,200.00 alone, in addition to reported income from the partnership. The total income for 1977 exceeds the $40,000.00 listed on the credit application. Thus, the Court cannot conclude the Debtor was' aware of unreported income for the 1977 tax year based upon the credit applications.

Evidence of the Debtor's 1971 conviction relating to illegal drugs is also lacking in persuasiveness for either tax year in question. While evidence of a conviction for criminal evasion has been identified as an indicia of fraud, there is no evidence the Debtor was ever convicted of criminal tax evasion. *Loftin and Woodard, Inc. v. United States*, 577 F.2d 1206, 1239 (5th Cir.1978).

The Court reviewed the testimony concerning the 1977 screening for counterfeit money. Considering the Debtor's banking background, the volume of cash, the purpose and place of review, it is unreasonable to believe the Debtor maintained an innocent mind and did not at least suspect the cash was the product of some questionable activity. Speculation, however, does not rise to the level of actual knowledge. Therefore the Court finds, based upon the evidence proffered for the 1977 tax year, the Debtor was not aware of unreported income.

The Court is not bound to accept the witness' testimony at face value if it is questionable. *Ruark v. C.I.R.*, 449 F.2d 311 (5th Cir.1971). As such, the Court does not accept the testimony of the Debtor as to her innocence for the 1978 tax year.

First, the March and November 1978 credit applications which were signed by the Debtor listed her ex-spouse's income as $150,000.00 and $200,000.00, respectively. The source of the income was identified as Harris Charter Air Company. The corresponding tax return for the 1978 tax year disclosed net income derived primarily from the sale of coins of $69,827.00 yielding taxable income of $37,870.00. The Court in *Wilson, supra*, held such disparagies as an indicia of fraud. Likewise, exceedingly large discrepancies between the petitioner's actual net income and the net income reported on the tax returns constitute evidence supporting fraud, when such discrepancies are unexplained. *Rogers v. C.I.R.*, 111 F.2d 987, 989 (6th Cir.1940). *Webb v. C.I.R.*, 394 F.2d 366, 378 (5th Cir.1968). The Debtor's only explanation centers around her failure to review the credit applications and the tax returns and of her reliance and dependency in her husband.

The testimony of Mr. Anderson places the Debtor's hand in the cookie jar. This Court is not inclined to believe the Debtor's testimony when there is evidence controverting it. For example, the Debtor contends her husband's income was derived from Harris Charter Air Company, but the IRS correctly pointed out Harris Charter Air Company was omitted from both the 1977 and 1978 tax returns and that the 1978 return failed to include any of the charter air companies in which the Debtor's husband was allegedly involved. Likewise, the Debtor claims no knowledge of the magnitude of the church contributions, yet by her own testimony she attended church weekly and knew the church's treasurer personally for several years. In addition, the church contributions were not claimed as a deduction for either the 1977 or 1978 tax returns. Any conduct, the likely effect of which would be to mislead or to conceal has been held as an indicia of fraud. *Spies v. U.S.*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). The reasonable inference to be drawn from failure to take such a tax worthy deduction is that the couple attempted to conceal their ownership of these funds.

The Court finds that the Debtor's contention that she blindly follows her husband's directions in signing the tax returns and the credit applications without even a cursory review is not a reasonable explanation for a substantial omission of the drug-related income from the tax returns. The Court finds the Debtor was neither a sophisticated business woman nor an uninformed housewife, but something in between. Clearly, she was a wife who not only actively participated in, but also enjoyed the fruits of the crime perpetrated by her husband. Therefore, based upon the testimo-

ny and evidence presented, the Court finds she filed a fraudulent return for the 1978 tax year.

Based on the foregoing, this Court finds the tax debt for the 1977 tax year to be a dischargeable debt. It further finds the tax debt for the 1978 tax year to be a nondischargeable debt. A separate final judgment will be entered in accordance with the foregoing.