**In re Shirley E. HOPKINS, Debtor.**

**Shirley E. HOPKINS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 88–00343. Adv. No. 88–0176.**

United States Bankruptcy Court, N.D. Ohio, W.D.

April 10, 1991.

ty of tax debt to the United States of America. Upon consideration of the evidence adduced at the trial and the stipulations and oral arguments of the parties, the court finds that said debt should not be discharged.

### FACTS

On June 17, 1988, Debtor/plaintiff filed a complaint to determine dischargeability of tax debt to the United States of America for tax years 1975, 1976 and 1977. As a result of defendant's motion for summary judgment, this court, on January 22, 1990, entered an opinion and order granting said motion as to the 1975 tax liability. Thereafter, a trial was held, on March 13, 1991, upon the remaining tax years which plaintiff seeks to discharge.

Plaintiff testified that she was employed by her husband's law firm prior to and during their marriage. She had no previous office experience. Initially, she was responsible for answering the phone. Subsequently, she became responsible for handling judgment accounts, including garnishment proceedings and releases. She also had some responsibility for receiving and entering in the ledger books, payments on accounts from Mr. Hopkins' clients. Rental receipts were also entered on these ledger cards. Mr. Hopkins would collect these payments at the end of the day.

Plaintiff also stated that Mr. Hopkins prepared their tax returns. She indicated that in obtaining the necessary information, Mr. Hopkins would ask her and the office secretary to total the amounts on the ledger cards. Plaintiff stated that she was without knowledge about the handling of monies resulting from personal injury suits. On one occasion, however, plaintiff recalled that Mr. Hopkins stated that the total ledger card amount "would never do." That comment did not, though, "stick in her mind" until sometime later when she accompanied Mr. Hopkins to an IRS audit. According to plaintiff, she never verified the information contained within the tax returns, neither did she inquire of Mr. Hopkins regarding the veracity of the returns.

C. Allen McConnell, Toledo, Ohio, for plaintiff.

Verne Armstrong, Asst. U.S. Atty., Toledo, Ohio, for U.S.

Henry J. Riordan, U.S. Dept. of Justice, Washington, D.C., for I.R.S.

## OPINION AND ORDER DETERMINING DISCHARGEABILITY OF DEBT

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on for trial upon plaintiff's complaint to determine dischargeabili-

She merely signed the income tax return upon Mr. Hopkins' presentation to her.

Mr. and Mrs. Hopkins were divorced in 1978. Plaintiff testified that sometime in 1977 or 1978, she and Mr. Hopkins went to Cleveland for an IRS audit. During that audit, plaintiff became aware that Mr. Hopkins may have been doing something wrong as she knew he lied to the IRS agent in responding to some of the questions asked of him. Later, she questioned Mr. Hopkins about his answers, but he told her not to worry about it. Because plaintiff was bothered about their discussion with IRS, she called IRS in Cleveland and was informed that someone in the Toledo office would be assigned to answer her questions. Thereafter, plaintiff had several discussions with IRS agents regarding Mr. Hopkins' office procedure.

Mr. Ray Peregoy, formerly a special agent with the IRS criminal investigation division, was involved in the IRS Hopkins' reviews. According to Mr. Peregoy, plaintiff was a "walk in"; that is, she represented a voluntary source of information. She appeared at his office sometime in August, 1978, providing allegations of the impropriety of Mr. Hopkins' tax practices. After this conversation, Mr. Peregoy prepared, as he does normally in the course of the performance of his duties, a memorandum of interview. See Government Exhibits 7, 8, 9 and 10.

Mr. Peregoy's discussions with plaintiff centered on transactions, involving certain real estate matters. One parcel, referred to as "Blum" was acquired by Mr. Hopkins and placed in plaintiff's brother's name, George Cox. Mr. Peregoy testified that plaintiff told him that her brother was unaware that he held title to this property at that time. Blum was rental property and plaintiff indicated that the rental income, received in 1976 and 1977 was not reported on the income tax returns. Upon cross-examination, however, Mr. Peregoy admitted that he failed to contact, or at least record contact, with tenants, verifying rental payments to Mr. Hopkins. Mr. Peregoy opined that plaintiff was aware of this

transaction as she conveyed many details regarding the nature of this transaction.

Another parcel upon which Mr. Peregoy focused was "Belmont", including 113 Belmont and 1008 Belmont. Mr. Peregoy testified that plaintiff told him that Mr. Hopkins was approached by Mr. Oscar Hughes to sell 1008 Belmont for him. Mr. Hughes lived in Chicago. After Mr. Hopkins told Mr. Hughes that he had found a buyer for the property, a blank deed was sent from Mr. Hopkins to Mr. Hughes who executed the deed and returned it. See Government's Exhibit 23. The purchase price for this property was $3,000, according to Mrs. Hopkins, however, about $868 was sent to Mr. Hughes as Mr. Hopkins deducted expenses, including title and attorney's fees, from the purchase price. Within a week after this transaction, Mr. Hopkins sold the property for $6,500 to Helen and Albert R. Bowman, Sr. See Government's Exhibits 24 and 25. Mr. Peregoy's impression was that plaintiff was aware of this transaction. The gain realized by this transaction was not reflected on the Hopkins' income tax return.

Additionally, property known as 1113 Belmont was conveyed to "Elizabeth Cox" which represents plaintiff's middle and maiden names. The address listed on this deed is that of Mr. Hopkins' first wife's. Plaintiff told Mr. Peregoy that this was done in order to hide the transaction. See Government's Exhibit 21.

Mr. Peregoy's opinion of plaintiff's involvement in these "sham" transactions was that she was culpable. That is, Mr. Peregoy felt that the details given by her reflected her knowledge of the transactions at the time. She, nevertheless, signed the income tax returns. She even indicated to Mr. Peregoy, at one point, that if it were not for her, Mr. Hopkins would not be able to arrange some of these transactions. During one interview with plaintiff, Mr. Peregoy was accompanied by a shorthand clerk whose responsibility was to record the entire interview. Mr. Peregoy felt, based upon his experience in interviewing hundreds of individuals, this recordation necessary as he was impressed that plain-

tiff was not entirely forthright; that is, plaintiff appeared to conveniently not recall things that involved herself.

Plaintiff also told Mr. Peregoy that a trust account was established by Mr. Hopkins as a means to hide transactions. Mr. Hopkins would direct plaintiff to deposit monies in this account, but she did not record the amount or nature of these deposits.

Plaintiff, at one point, testified that the signature of Shirley E. Hopkins on the Hopkins' 1977 income tax return was not hers. She believed she could not have signed this return as she was no longer living with, nor seeing, Mr. Hopkins; the parties were divorced in 1978. Mr. William Riordan, employed by the IRS in the national forensic laboratory is responsible for examining documents to determine authorship. He testified that, in his professional opinion, based upon written exemplars representing known documents executed by plaintiff, the signature on the 1977 income tax return was signed by the same individual who signed the exemplars, plaintiff.

Mr. David Orlowski, employed by the U.S. Treasury Department as a revenue agent, explained that his familiarity with the Hopkins' tax returns arose due to his cooperation with the criminal investigation division. His job includes reviewing books and records to determine the accuracy of income and expenses listed on returns. In the Hopkins' case, he explained, this was not possible as a double set of books existed, and he was unable to verify the information contained in them. Alternatively, he used the net worth method to determine the accuracy of the income reported by them. This method utilizes third party information, including courthouse records and title searches. In calculating the net worth, Mr. Orlowski totals the owned assets and known liabilities. The amount by which the assets exceed liabilities, represent income. If this calculated income did not compare with that reported on the return, Mr. Orlowski has to assume that an individual has unreported income.

Reviewing the Hopkins' 1976 joint return, Mr. Orlowski stated that no rental income from Blum was reported. Additionally, the capital gain realized from the sale of 1008 Belmont was not reported, at least not by that location. Again, Mr. Orlowski did not verify with tenants, rental income paid to the Hopkins. Other monies constituting income, in Mr. Hopkins legal profession, include personal injury settlements. However, Mr. Orlowski opined that there exists no verifiable method of calculating this amount.

Mr. Richard Brechmacher, employed as a revenue officer with IRS, is responsible for collecting delinquent tax liabilities. In that capacity, he researches property titles in order to locate collateral sources for delinquent taxes. Currently, as of March 13, 1991, there is an outstanding balance for the 1976 tax year, on the Hopkins' return, of $33,670.16, representing taxes due, interest accruing and penalties, and for 1977, $31,929.51. Mr. Brechmacher stated that plaintiff currently holds title to properties previously referred to as Belmont and Blum. Sales of these properties were attempted, but the properties were subsequently released to plaintiff, due to lack of interest. These properties have, also, depreciated in value. One property was purchased by the government. No credit of this purchase has yet been made, however, as plaintiff has the period of redemption, during which she may repurchase the property, has not yet expired.

## DISCUSSION

The parties seek a determination of dischargeability pursuant to 11 U.S.C. § 523(a)(1)(C). That section does not discharge any debt—

> (1) for a tax or a customs duty—
>
> * * * * * *
>
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax....

This section provides two alternative grounds for which a tax liability may be declared nondischargeable. *In Re Carapella*, 105 B.R. 86, 89, 19 B.C.D. 993

**106**

(Bkrtcy.M.D.Fla.1989), *aff'd* 115 B.R. 365 (M.D.Fla.1990).

> The first is where the debt is for a tax with respect to which the Debtor made a fraudulent return. The second is where the debt is for a tax with respect to which the Debtor willfully attempted in any manner to evade or defeat such tax.

*Id. See also In Re Fernandez*, 112 B.R. 888, 891 (Bkrtcy.N.D.Ohio 1990) (legislative history of § 523(a) reflects Congress' intent to preclude the dischargeability of tax obligations on which Debtor made a fraudulent return or willfully attempted to evade or defeat a tax liability). Initially, the court notes that the issues before the court is the dischargeability of a tax debt, not the extent of Debtor's liability. *In Re Kirk*, 98 B.R. 51, 54 (Bkrtcy.M.D.Fla.1989) (were the issue before this court a tax liability determination pursuant to § 505, the focus would be on the extent of the underlying liability of Debtor; conversely, a § 523 determination focuses on whether a tax debt is dischargeable).

 IRS has the burden to prove an actual, intentional wrongdoing by Debtor. *Kirk*, 98 B.R. at 54. The measure of proof necessary to establish fraud is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The elements IRS must establish are:

> (1) knowledge of the falsehood of the return;
>
> (2) an intent to evade the taxes; and,
>
> (3) an underpayment of the tax.

*Kirk*, 98 B.R. at 55 (citation omitted). *See also In Re Harris*, 59 B.R. 545 (Bkrtcy. W.D.Va.1986) (only condition precedent to nondischargeability of tax debt under pertinent language of § 523(a)(1)(C) is making of fraudulent tax return by Debtor). Fraud is rarely proven by direct evidence, rather circumstantial evidence may be established by Debtor's conduct and inferences drawn therefrom. *Kirk*, 98 B.R. at 55. *See also Carapella*, 105 B.R. at 89 (direct evidence of fraud is seldom demonstrated; fraud may be established by circumstantial evidence).

Plaintiff repeatedly stated that she was unaware of any omissions or wrongdoings in the filing of their income tax returns for 1976 and 1977. She opined that she was not in a position to question her husband's preparation of their joint return. The court is not persuaded by this testimony. That is,

> [t]he court finds that the Debtor's contention that she blindly follows her husband's directions in signing the tax returns and the credit applications without even a cursory review is not a reasonable explanation for a substantial omission of the ... income from the tax returns. The court finds the Debtor was neither a sophisticated business woman nor an uninformed housewife, but something in between. Clearly, she was a wife who not only actively participated in, but also enjoyed the fruits of the crime perpetrated by her husband.

*Kirk*, 98 B.R. at 58.

An analogous fact pattern to that of the instant situation is presented in *Shea v. C.I.R.*, 780 F.2d 561 (6th Cir.1986). *Shea* involved an appeal from a tax court's decision holding a wife liable for tax deficiencies, and disqualifying her from the innocent spouse exception. *Id.* at 563. Mrs. Shea testified that she worked for her husband in their business and, at his direction, wrote checks and made distributions. *Id.* She further indicated that her husband was the only individual who examined the corporate financial records. *Id.* Initially, the sixth circuit stated, "[w]hen a joint return is filed, the parties are jointly and severally liable for the amount of tax due." *Id.* at 564. The court also set forth four requirements for qualification as an "innocent spouse" as:

> The first requirement ... is that the tax return in question must be a joint return.
>
> \* \* \* \* \* \*
>
> The second requirement to qualify for innocent spouse protection is that the tax return must contain substantial understatements attributable to grossly erroneous items.
>
> \* \* \* \* \* \*

The petitioner next must establish that she did not know, and had no reason to know, of the substantial understatements.

\* \* \* \* \* \*

The last requirement ... requires the petitioner to show that it would be inequitable, under all the facts and circumstances, to hold her liable for these tax deficiencies.

*Id.* at 565, 567. In determining whether the taxpayer "did not know, and had no reason to know," a reasonable person standard should be followed. That is,

"[t]he standard to be applied in determining whether a taxpayer had reason to know of omissions is whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know of the omissions."

*Id.* at 566 (citation omitted). Finally, the *Shea* court stated that "being a homemaker ... cannot relieve a taxpayer of joint and several tax liability." *Id.*

Plaintiff testified that she was involved in her husband's business, including writing receipts. Although she was not the only individual to perform this duty in the office, she, no doubt, had an awareness of the amount of incoming funds. Her participation in the business, and performance of routine tasks, "negate an innocent spouse claim." *Shea,* 780 F.2d at 566 (citations omitted). Additionally, under the circumstances, and with minimal effort, a reasonable taxpayer would have inquired into the financial status, discovering the omitted income. *Id.* (under these circumstances, petitioner's failure to know of the omissions on her tax return resulted from her own failure of prudence; we conclude that petitioner had reason to know of the omissions and opportunity to easily discover them).

Additionally, reviewing further the testimony of Mr. Peregoy, the court is persuaded that plaintiff had knowledge of the parties' fraudulent tax returns. As stated, Mr. Peregoy was convinced that plaintiff was aware of the parties' financial dealings as she gave very specific details of the real estate transactions and the trust fund deposits. Most notably, plaintiff told Mr. Peregoy that rental income was not reported on the income tax returns. *See supra* p. 104. Plaintiff also related to Mr. Peregoy, Mr. Hopkins' sale of the Belmont property, which resulted in a capital gain, not reported on the parties' income tax return. *Supra* p. 104. Mr. Peregoy testified that plaintiff told him that if it were not for her, Mr. Hopkins would have been unable to arrange some of these transactions. *Supra* p. 104. Lastly, plaintiff told Mr. Peregoy, at one point, that Mr. Hopkins, in her presence, stated that the total monies received "would never do." *Supra* pp. 103–04. At that juncture, if not sooner, plaintiff should have known that the income tax returns were improper. *See also* Government Exhibit 9 at 2. Based upon this testimony, the court is persuaded that plaintiff knew, or at the very least, had reason to know that the 1976 and 1977 returns contained omissions. Finally, in closing argument, plaintiff's counsel stated that perhaps plaintiff had some "inkling" that Mr. Hopkins' handling of the parties' income tax returns was not proper, she, nevertheless, testified honestly and truthfully. Because this court finds that the debts owed IRS represent a tax to which plaintiff made a fraudulent return or willfully attempted to evade such tax, by signing returns which she knew were in error, the amounts owed for the tax years 1976 and 1977 should not be discharged. It is therefore

ORDERED that plaintiff's tax liability for the years 1976 and 1977 be, and hereby are, excepted from discharge.