**In re Leroy Charles GRIFFITH, Debtor.**

**Leroy Charles GRIFFITH, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Bankruptcy Nos. 93–10148–BKC– AJC, 93–0361–BKC–AJC–A.**

United States Bankruptcy Court, S.D. Florida.

Dec. 9, 1993.

Jordi Guso, Robert Roth, Miami, FL, for plaintiff.

Mark Stier, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION [1]

ERWIN I. KATZ, Bankruptcy Judge, sitting by special designation.

This adversary proceeding comes before the Court on the complaint of Leroy Charles Griffith ("Griffith") to determine the dischargeability of his federal income tax debt. After considering the arguments and evidence presented, the Court enters these Findings of Fact and Conclusions of Law. This is a core proceeding over which the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).

### BACKGROUND

Griffith owned entertainment theaters since the early 1960's. Griffith used several corporate entities to control the theaters. These entities include, but are not limited to:

- Gayety Theaters, Incorporated: Shareholders are Linda Rivera Griffith ("Linda") and Griffith, held as tenants in the entirety, pursuant to the antenuptial contract between Linda and Leroy dated June 8, 1989. Griffith testified that prior to June 8, 1989, the stock was divided between Griffith, his son, his father, and Linda. The Tax Court, however, found that Griffith was the sole shareholder in the years in question.[2]

- Ell Gee, Incorporated: Shareholders are Linda and Griffith, held as tenants in the entirety, pursuant to the antenuptial contract between Linda and Griffith dated June 8, 1989. Griffith testified that prior to June 8, 1989, the stock was divided between Griffith, his son, his father, and Linda. The Tax Court, however, found that Griffith was the sole shareholder in the years in question.[3]

- Nu–Wave, Attractions, Incorporated: Linda is the only shareholder but Griffith is an officer: Nu–Wave owns real estate used in Griffith's businesses.

No evidence was presented regarding what each of these businesses controlled. Griffith signed checks on the accounts of all the corporations.

Griffith did not have a personal checking account, but used these corporate entities to pay his personal expenses. Griffith did not own a car or a house but drove a car owned and depreciated by Gayety and rented a house in Miami which was owned and depreciated by Gayety. Griffith paid $1,200 a month rent on the house by increasing the open loan account he maintained with Gayety. Griffith testified he would use his income from the corporations to pay down these loans when possible.

It was not uncommon for Griffith to withdraw large amounts of cash from the accounts of all the corporations. The nature of Griffith's business made it important that a paper trail not be created, so cash was often used in business transactions. Leftover cash was spread back into the accounts in a manner to keep their balances above zero. Overdrafts were common in the accounts so Griffith transferred money between Ell–Gee and Gayety to keep the balances above zero to avoid overdraft charges.

1. Judge Erwin I. Katz, United States Bankruptcy Judge, Northern District of Illinois, is sitting by Special Designation in this case in the Southern District of Florida.

2. *See* the discussion of the Tax Court opinion, *infra* p. 730.

3. *See* the discussion of the Tax Court opinion, *infra* p. 730.

The Internal Revenue Service (hereinafter "IRS") audited Griffith in regard to the tax years 1969–1970, 1972–1976, and 1978. The IRS found Griffith understated his tax liability and owed back taxes along with interest and penalties. The Tax Court, in an eighty-six page opinion dated September 19, 1988, found Griffith's practice of having Gayety deduct depreciation for Griffith's residence was not proper, but was not fraudulent. Griffith testified he read this opinion.

NuWave was incorporated October 10, 1988. Linda owned all the stock but did not receive a salary. Griffith took care of the day-to-day operations. Gayety and NuWave maintained checking accounts at Capital Bank. Capital Bank would cash Griffith's checks without question, i.e. Griffith cashed a $25,000 check from NuWave on June 15, 1992. Griffith signed the required federal form for that transaction as the owner of NuWave. On December 31, 1992, Show World, one of Griffith's corporations, went out of existence and its assets, which consisted mainly of real estate, were merged into NuWave.

On June 8, 1989, Linda and Griffith were married after having lived together for at least ten years. On this same day, they entered into an antenuptial agreement. Pursuant to that agreement Griffith assigned his capital stock in Gayety, Ell–Gee and Paris Follies, Inc. along with approximately $390,-000 in promissory notes from his son and Linda, to Linda and himself as tenants by the entirety. In exchange, Linda relinquished all potential claims against the future earnings of Griffith. Griffith testified he did not make this agreement with the intent of frustrating the government's efforts to collect his tax debt, but failed to provide any explanation for this transfer.

On September 28, 1989, the IRS made an assessment against Griffith. In 1991, the IRS assigned Linda Simmons, a revenue officer for the IRS, to collect Griffith's taxes. She learned Gayety was Griffith's employer from his 433(a) form, a collection information statement for individuals, signed by Griffith under penalty of perjury. When she attempted to serve the levy on Gayety in May

1991, Griffith told her he did not receive a salary from Gayety and he referred her to his attorney. At trial, he testified he may have received one or two checks after the IRS levied. Simmons testified she did not find any evidence Griffith received a salary.

Simmons testified that she reviewed various records of the corporations. Her review reflected that Ell–Gee deposited $782,934.36 at Capital Bank between December 31, 1991 and January 1993, Gayety deposited $335,-775.33 at Capital Bank between May 31, 1992 and January 31, 1993, and NuWave deposited $748,598.04 at Capital Bank between December 31, 1991 and January 1993. Some of these deposits may have been circular, from Ell–Gee to Gayety and vice-versa, to inflate balances to avoid overdraft charges. Simmons testified that the tax returns for Ell–Gee, Gayety and Nu–Wave in 1988, 1989 and 1990 each reflected a loss.

No payments have been made on the tax debt. The balance due of the tax debt as of the petition date, including interest and penalties, totals $1,984,121.66. Griffith testified he is aware of the debt but has no way to pay it. Griffith testified he attempted to settle this debt several times and that he gave his attorney authority to settle this debt. No specific settlement attempts or terms were disclosed.

## ALLOWANCE OF THE COUNTERCLAIM

■ On January 15, 1993, Griffith filed a voluntary Chapter 7 bankruptcy petition. On or about April 17, 1993, Griffith initiated this Adversary Proceeding seeking a determination that his debt to the IRS was not excluded from discharge by § 523(a)[4] or any other provision of law. In its Answer, the IRS denied that Griffith's tax debt was dischargeable. When the case was called to trial on July 28, 1993, Griffith's attorney submitted a stipulation to the Court wherein the IRS stipulated that the tax liability was dischargeable under §§ 507(a)(7)(A)(i) and (ii) and 523(a)(1)(B)(ii). Griffith's attorney then rested his case and moved for judgment in his favor. This Court granted the IRS'

---

**4.** All references herein are to the Bankruptcy Code, 11 U.S.C., unless otherwise noted.

*ore tenus* motion to amend its Answer and assert a counterclaim setting forth that the debtor's tax liability is excepted from discharge under § 523(a)(1)(C) because Griffith attempted to evade or defeat his tax liability. The IRS claimed that Griffith's actions whereby he entered into an antenuptial agreement which transferred assets out of the IRS' reach, structured his corporations to own his residence and car in order to keep them from the IRS' grasp and took no salary or other remuneration from corporations which he controlled, were efforts to evade or defeat the payment of taxes. Griffith argues that this Court erred by permitting the IRS to amend its answer and assert § 523(a)(1)(C) as a counterclaim.

■ The burden of proving that the debtor's tax liabilities are nondischargeable under § 523(a)(1)(C) is on the IRS. *In re Berzon,* 145 B.R. 247 (Bankr.N.D.Ill.1992); *In re Fernandez,* 112 B.R. 888 (Bankr.N.D.Ohio 1990); *In re Kirk,* 98 B.R. 51 (Bankr.M.D.Fla.1989). In the instant case, the IRS denied Griffith's debt was dischargeable, citing § 523(a). Both Griffith and the IRS failed to refer specifically to § 523(a)(1)(C), in the Complaint or Answer, nor was § 523(a)(1)(C) pled as a counterclaim or an affirmative defense, as required by Bankruptcy Rule 7008(a).[5] When Griffith failed to specify the subsections of § 523(a) being relied upon, the IRS should have moved for a more definite statement under Bankruptcy Rule 7012(e). The ambiguity created by the pleadings was perpetuated by both Griffith and the IRS.

Bankruptcy Rule 7015 provides that leave to amend pleadings "shall be freely given when justice so requires." Bankruptcy Rule 7013(f) provides that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment."

■ A party may amend if "(1) [it] has not unduly delayed, (2) [it] is not acting in bad faith or without dilatory motive, (3) the op-

posing party will not be unduly prejudiced by the amendment, and (4) the amendment is not futile." *Storwal Intern., Inc. v. Thom Rock Realty Co., L.P.,* 784 F.Supp. 1141 (S.D.N.Y.1992). Griffith argues the IRS unduly delayed in bad faith by waiting until the trial had commenced before attempting to amend. Griffith was put on notice that the IRS was using § 523(a)(1)(C) as a defense at least as early as June 29, 1993, when the IRS noted in its Motion To Reopen Discovery that it (the IRS) was defending against the complaint based on § 523(a)(1)(C). The Court notes that § 523(a), without further specification, was referenced in Griffith's complaint. The Complaint, therefore, placed into issue all of the elements of § 523(a), including § 523(a)(1)(C). The answer did not add any specificity. As previously discussed the parties should have better defined the issues in their pleadings. However, the Court does not find this answer to be made with bad motive.

Griffith argues he was unduly prejudiced by the amendment. Griffith's attorneys argue they relied on the IRS' failure to amend prior to trial, and therefore failed to anticipate having to defend against such an argument. The reliance argument is somewhat weakened by the pre-trial motion history. The Court notes that the issues were argued in the Motion to Reopen Discovery, filed on June 29, 1993. The record will further reflect that at the outset of the trial the Court extended to Griffith the option to continue the trial date and allow further discovery as well as time to prepare additional defenses. Griffith declined the offer. The claim of surprise was waived. The Court does not find Griffith was prejudiced by allowing this amendment.

Finally, this amendment was not futile. This amendment was necessary due to poor pleading, and § 523(a)(1)(C) is the only issue in this case.

## COLLATERAL ESTOPPEL

■ Griffith argues the IRS is collaterally estopped by the Tax Court's determina-

---

**5.** Rule 7008(a) requires that a plea in the nature of an avoidance must be asserted as an affirma-  tive defense.

tion issued September 19, 1988. The Eleventh Circuit has "affirmed the use of collateral estoppel in dischargeability proceedings." *In re Powell*, 95 B.R. 236, 238 (Bankr. S.D.Fla.1989); *see In re Latch*, 820 F.2d 1163 (11th Cir.1987); *In re Halpern*, 810 F.2d 1061 (11th Cir.1987). In order for collateral estoppel to be applied in dischargeability proceedings, three elements must be present:

(1) the issue at stake must be identical to the one involved in the prior litigation;

(2) the issue must have been actually litigated in the prior litigation; and

(3) a determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action.

*Id.* at 238.

The burden of proof standards are not the same. The Tax Court used "clear and convincing evidence" as the standard to determine whether Griffith was liable for fraud. In this proceeding "preponderance of the evidence" is the standard. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Secondly, the Tax Court only considered whether Griffith fraudulently under-reported his income tax for the years 1969–1970, 1972–1976 and 1978. The allegations in this case refer to actions taken after the entry of the Tax Court decision in an attempt to evade or defeat the payment of the tax liabilities imposed by the Tax Court. Accordingly, the issue at bar is not the same issue decided by the Tax Court.

## DISCHARGEABILITY

■ The burden of proving that the debtor's tax liabilities are nondischargeable is on the IRS. *In re Fernandez*, 112 B.R. 888 (Bankr.N.D.Ohio 1990); *In re Kirk*, 98 B.R. 51 (Bankr.M.D.Fla.1989). The IRS must prove nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Thus, the IRS will meet its burden if it shows that it is more probable than not that Griffith willfully attempted to evade his taxes. *In re Berzon*, 145 B.R. 247, 250 (Bankr.N.D.Ill.1992).

## Section 523

■ Section 523 of the Bankruptcy Code provides that certain tax debts are not dischargeable in a Chapter 7 case. The language in § 523 that is relevant to the instant dispute is:

[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for a tax ... with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

11 U.S.C. § 523(a)(1)(C).

## Does Section 523(a)(1)(C) Cover the Evasion of the *Payment* of Taxes?

The IRS does not claim that Griffith made a fraudulent return. Rather, IRS asserts that Griffith's tax liability, as determined by the Tax Court, is non-dischargeable due to Griffith's actions in attempting to place his assets beyond the reach of the IRS.

The case law has not come to a consensus on whether § 523(a)(1)(C) covers the evasion of the payment of taxes. One line of reasoning looks to the similar language used in § 7201 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 7201, a criminal statute, to provide guidance. *See In re Gathwright*, 102 B.R. 211 (Bankr.D.Ore.1989), wherein that court reasoned that since IRC § 7201 specifically provides that it is a felony to willfully attempt to evade or defeat any tax or the payment thereof, and § 523(a)(1)(C) does not have the phrase "or payment thereof," found in IRC § 7201, § 523(a)(1)(C) does not extend to actions to evade or defeat the *payment* of a tax.

■ This Court disagrees with *Gathwright*. This Court follows the reasoning of *In re Jones*, 116 B.R. 810 (Bankr.Kan.1990) and *In re Berzon*, 145 B.R. 247 (Bankr. N.D.Ill.1992) to reject *Gathwright*. Section 523(a)(1)(C) is to be read in the disjunctive. *In re Gilder*, 122 B.R. 593, 595 (Bankr. M.D.Fla.1990). The Court finds the modifying phrase of § 523(a)(1)(C), "in any manner," is sufficiently broad to include willful attempts, like Griffith's, to evade taxes by

concealing and transferring assets to protect them from execution or attachment.

### What Is Meant By Willful As Used In 523(a)(1)(C)?

█ Griffith argues that willful as used in § 523(a)(1)(C) should be defined in accordance with the substantially similar criminal IRC § 7201 [6] which courts have held requires an affirmative act of fraud with an evil motive. *See* Darrell Dunhaham & Alex Shimkus, *Tax Claims in Bankruptcy*, 67 Am. Bankr.L.J. 343, 384 (1993). The IRS counters by arguing the court should not be guided by IRC § 7201 but IRC § 6653 [7], a civil section that does not require an affirmative act. In the alternative, the IRS argues the Court should follow the Court in *Berzon* and *Cinquegrani v. United States,* 1993 WL 134752 (Bankr.N.D.Ill. Feb. 1, 1993), and look to the "badges of fraud" to infer fraudulent intent and not solely look for an affirmative act of fraud.

This Court finds willful should be read in accordance with other civil sections. The Court will follow the principle that "in criminal statutes willfulness generally requires bad purpose or the absence of any justifiable excuse ... In civil actions, however, these elements need not be present. Rather, willful conduct denotes intentional, knowing and voluntary acts." *Monday v. United States,* 421 F.2d 1210 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). This same view of "willful" was recently upheld in *Domanus v. United States,* 961 F.2d 1323, 1326 (7th Cir.1992). Other courts have reached the same conclusion. *See In re Gilder,* 122 B.R. 593, 595 (Bankr.M.D.Fla. 1990); *In re Kirk,* 98 B.R. 51, 55 (Bankr. M.D.Fla.1989); *U.S. v. Toti,* 149 B.R. 829 (E.D.Mich.1993); *In re Fernandez,* 112 B.R. 888 (Bankr.N.D.Ohio 1990); *In re Langlois,* No. 91–91194 (Bankr.S.D.N.Y.1992); *In re Jones,* 116 B.R. 810, 815 (Bankr.Kan.1990).

█ The Court may use various kinds of circumstantial evidence to infer fraudulent intent since direct evidence of such an intent rarely exists. *Berzon,* 145 B.R. at 250; *Cinquegrani* 1993 WL 134752 at *5; *Hagaman v. Commissioner* [92–1 USTC P 50,141], 958 F.2d 684, 696 (6th Cir.1992); *Bradford v. Commissioner* [86–2 USTC P 9602], 796 F.2d 303, 307–08 (9th Cir.1986); *Loftin and Woodard, Inc. v. United States* [78–2 USTC P 9645], 577 F.2d 1206, 1238–39 (5th Cir.1978). These "badges of fraud" include: (1) the recurrence of the understatement of income for more than one tax year; (2) the understatement of income; (3) implausible or inconsistent explanations of behavior; (4) inadequate records; (4) transfer of assets to a family member; (5) transfer for inadequate consideration; (6) transfer that greatly reduced assets subject to IRS execution; and (7) transfers were made in the face of serious financial difficulties. *Eyler v. Commissioner,* 760 F.2d 1129 (11th Cir.1985); *Douge v. Commissioner* [90–1 USTC P 50,186], 899 F.2d 164, 168 (2d Cir.1990); *Bradford* [86–2 USTC P 9602], 796 F.2d at 307–08; *Loftin and Woodard* [78–2 USTC P 9645], 577 F.2d at 1238–39. Griffith argues he did not conceal assets, making his case factually distinguishable from the debtors in *Jones* [8] and *Berzon* [9]. The Court does not agree.

█ Parenthetically, the Court notes those issues which have not been raised by the IRS. The IRS is not claiming in this proceeding that any action by Griffith before the date of the Tax Court decision constituted a non-dischargeable attempt to evade or defeat any tax. Nor does this proceeding involve income or taxes for any years after 1978. Thus the narrow question before this Court is whether the IRS has shown, by a preponderance of the evidence, that Griffith has willfully attempted to evade or defeat the tax liability for the tax years 1969–70, 1972–76 and 1978 as determined by the Tax Court decision of September 19, 1988.

---

6. IRC § 7201 states:
   Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall ... be guilty of a felony. . . .

7. IRC § 6653 does not define fraud. Case law has determined the appropriate definition of fraud in reference to § 6653.

8. The debtor placed title to their home and lake property in names of others in order to evade taxes.

9. The debtor significantly misrepresented his income by depositing his wages into his girlfriend's bank account.

The seeds for Griffith's plan to evade the tax owed to the IRS were conceived once the Tax Court issued its determination in September 1988. After a gestatory period, nine months later, in June 1989, after living together for more than ten years, Griffith and Linda were married and begat the antenuptial agreement. Griffith asserts that the antenuptial agreement was an arms length mutual exchange wherein both parties gave up some rights and acquired others. In reality, Linda gave up her rights to make claims in the future against Griffith or his estate, but these claims were de minimis. At that time, Griffith owed the IRS a significant amount of money. His businesses had not made a profit in a number of years and had no prospects of reversing this losing trend. The promissory notes assigned to Linda totalling approximately $390,000 were all notes wherein the obligor was either Griffith's son or Linda. In return, Linda received, not in her sole name but as a tenant in the entirety with Griffith[10], stock in these corporations which had little value due to the continuing losses of these corporations. This was an exchange to a family member, during a period of serious financial difficulty, for inadequate consideration to evade and defeat payment to the IRS.

Griffith's corporate legerdemain standing by itself would be insufficient to establish evasion under § 523(a)(1)(C). However, while Griffith's pattern of personal-corporate commingling of funds were similar in both pre–1988 and post–1988 years, they reflect his intent to evade meeting his personal obligations. The "badges of fraud" identified in the case law are simply factors taken into consideration by various courts attempting to ascertain a state of mind. The Court notes further that Griffith's manner as a witness, as well as that of his wife, was evasive and lacked that ring of forthrightness reflective of an open and credible witness.

Griffith also argues that the reasoning of the IRS would mean that filing bankruptcy would be considered an effort to evade taxes under § 523(a)(1)(C), resulting in taxes never being dischargeable. Both the Tax Code and the Bankruptcy Code provide for acceptable means to lessen or discharge tax liability. The evade and defeat provision of § 523(a)(1)(C) is not one of them. The Bankruptcy Code in § 507(a)(7) has specific guidelines that determine when tax debts are dischargeable.

Finally, Griffith emphasizes that he made several attempts to settle this debt with the IRS, demonstrating he was not attempting to evade this debt. Griffith testified he attempted to settle this debt but he could not recall any specifics regarding his attempts. There is no other evidence of any attempts to settle this debt. Accordingly, the Court gives little value to Griffith's testimony that he attempted to settle this debt with the IRS.

Looking at the surrounding circumstance, the Court finds Griffith willfully attempted to evade and defeat paying the taxes due. The transfers under Griffith's antenuptial agreement were an attempt to willfully evade and defeat the payment of taxes. Griffith alleges the antenuptial agreement was a mutual exchange but, as explained previously, Linda gave up, and received nothing of value in order to help Griffith keep assets from the reach of the IRS. The antenuptial transfer was an act intentionally undertaken in the face of a large debt, to a family member, which greatly reduced the assets subject to IRS execution in order to defraud the IRS. Further, the transfer of assets from Showcase, a Griffith corporation, to NuWave, Linda's corporation, demonstrates intent to keep assets out of the reach of the IRS. Accordingly, Griffith had specific intent to willfully evade and defeat a tax he knew was due and owing.

## CONCLUSION

For the reason stated herein, the Court finds Griffith's debt to the IRS is nondischargeable according to § 523(a)(1)(C).

---

10. By holding title to these assets as tenants in the entirety, the IRS could not levy against these assets unless it (the IRS) had judgments against both Linda and Griffith. *See Matter of Geoghe-*gan, 101 B.R. 329 (Bankr.M.D.Fla.1989); *U.S. v. One Single Family Residence,* 894 F.2d 1511 (11th Cir.1990).