**In the Matter of Clarence George KOEHL, Corinne Dale Koehl, Debtors.**

**Clarence George KOEHL, Corinne Dale Koehl, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 92–14569–JAB.
Adv. No. 92–1265–JAB.**

United States Bankruptcy Court, E.D. Louisiana.

Dec. 8, 1993.

Peter J. Losavio, Jr., Baton Rouge, LA, for debtors/plaintiffs.

John M. Bilheimer, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

### MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came before the Court on the complaint for discharge of taxes filed by Clarence George Koehl ("C.G. Koehl") and Corinne Dale Koehl ("Corinne Koehl"). The United States of America, through the Tax Division of the U.S. Department of Justice, objects to the discharge pursuant to 11 U.S.C. § 523(a)(1)(C), alleging that the debtors willfully attempted to evade or defeat the income taxes they owed. A trial on the merits was held on May 26, 1993. After reviewing the pleadings, the evidence at trial, and the arguments of counsel, the Court makes the following determinations.[1]

### FINDINGS OF FACT

A.  *Tax Problems*

1.  The debtors' income tax returns for the years 1978 through 1983 were prepared by Mr. Jay West, CPA, ("West") who thoroughly reviewed the debtors' books.

2.  The Internal Revenue Service ("IRS") audited the debtors' income tax returns for the years 1978 through 1983. (Pl. 6, Pretrial Order, Uncontested Material Fact # 1).

3.  The debtors were aware of the audit by 1985. (Pl. 6, Uncontested Material Fact # 2).

4.  At the conclusion of the audit, by letter dated May 26, 1989, the IRS proposed to assess the debtors for tax deficiencies in the following amounts:

| | |
|---|---|
| 1978 | $317,950.97 |
| 1979 | 371,131.88 |
| 1980 | 141,172.00 |
| 1981 | 90,489.64 |
| 1982 | 111,329.00 |
| 1983 | 115,037.00 |

Negligence and delinquency penalties were also proposed to be assessed. No fraud penalties were proposed to be assessed. (Pl. 6, Uncontested Material Fact # 3).

5.  West, who originally prepared the returns, did not agree with the proposed assessment by the IRS. West testified that the IRS used the bank deposit method of calculating taxes, did not take into consideration inter-company transactions, did not account for all transfers, and did not correctly account for loans from outside banks. He advised the debtors that the assessment was a "joke" and "unrealistic", and informed the debtors it would "be in their best interest to fight". Although he was unsure exactly when he received the "30–day letter" from the IRS, dated September 28, 1988, he did not think it would have been before October 3, 1988.

6.  By petition filed on August 28, 1989, the debtors petitioned the United States Tax Court for a redetermination of the proposed deficiency. (Pl. 6, Uncontested Material Fact # 4).

7.  The debtors eventually agreed to the assessments as proposed. By stipulated decision entered on October 16, 1991, the Tax Court found the debtors liable for the taxes set forth above in Finding of Fact # 4, in the following amounts:

| | |
|---|---|
| 1978 | $317,950.97 |
| 1979 | 371,131.88 |
| 1980 | 141,172.00 |
| 1981 | 90,489.64 |
| 1982 | 111,329.00 |
| 1983 | 115,037.00 |

---

1.  This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law in accordance with Bankruptcy Rule 7052. The Court has jurisdiction over this matter under 28 U.S.C. § 1334. The matter is a core proceeding under 28 U.S.C. § 157(b)(2).

(Pl. 6, Uncontested Material Fact # 5). The Tax Court decision also found the debtors liable for negligence and delinquency penalties on these amounts. (*Id.*)

8. The taxes and penalties, together with then-accrued interest, were assessed on November 25, 1991. The taxes and penalties are not now assessable. (Pl. 6, Uncontested Material Fact # 6).

B. *Other Financial Problems*

9. In addition to the income tax debt, the debtors were experiencing other severe financial problems during 1988. These financial difficulties included a substantial loss of money from a salvage operation in Mexico; declining enrollment and decreased revenue from the Moler Beauty College, a business operated by Corinne Koehl through a company called Corinne Koehl Inc.; and declining revenues from a construction company owned by C.G. Koehl, such that the company was basically out of business. The decline in the debtors' businesses had been going on since approximately the mid–1980's, due to the oil bust in the area. As a result of these problems, several mortgage loans owed by the debtors were in arrears, and real estate taxes were unpaid. The debtors were in a dire financial condition and needed to raise money.

C. *The Trusts*

10. The debtors established two trusts, called the C.G. Koehl Trust (Ex. 4) and the Corin Koehl Trust (Ex. 7)[2], by separate instruments dated October 3, 1988. The debtors are the settlors of both of the trusts. The beneficiaries of both trusts are the debtors' four children: Dale J. Koehl, Timothy D. Koehl, Robert G. Koehl ("Robert Koehl"), and Jonette Franks Koehl. (Pl. 6, Uncontested Material Fact # 7).

11. Robert Koehl, a son of the debtors, testified that the trusts were established as part of the estate planning recommended by R. Travis Douglas, the debtors' attorney ("Douglas"). He stated that the trusts were established because of C.G. Koehl's concern that he would soon pass away. The debtors were both at advanced ages and C.G. Koehl's health was failing.

12. Douglas testified that C.G. Koehl was concerned about the expenses of probating wills, and wanted his children to avoid having to face this expense. (Ex. 26, Deposition of R. Travis Douglas).

13. When the trusts were established, the stock of C.G. Koehl, Inc. was placed into the C.G. Koehl Trust, and the stock of Corinne Koehl, Inc. was placed into the Corin Koehl Trust. In this way, C.G. Koehl's construction business was in a trust bearing his name, and Corinne Koehl's beauty college business (though named Moler Beauty College) was in a trust bearing her name.

14. West testified that in October, 1988, C.G. Koehl, Inc. was worth nothing or was insolvent. The company may have had some small operations, but nothing significant, and was basically not operating. The company had few assets, mostly real estate, on which the mortgages either equalled or exceeded the value of the real estate.

15. West testified that the value of the stock of Corinne Koehl, Inc. on the date of transfer was $12,000. This value was obtained from the value of the stock on the income tax returns of Corinne Koehl, Inc.

16. The Louisiana Land Trust was also established on October 3, 1988, by the debtors' four children. (Ex. 15). The debtors' children were the beneficiaries and the settlors of the Louisiana Land Trust. (Pl. 6, Uncontested Material Fact # 8).

17. Robert Koehl testified that the Louisiana Land Trust was established by the debtors' children to acquire the property of the debtors. He stated that there was no market for the property, and the children wanted to keep intact the property owned by the debtors. Property taxes were owed on the properties, and the mortgage payments were consistently late and in arrears. The debtors needed to sell assets to raise money to pay the creditors. Thus, the transfer of the property to the Louisiana Land Trust benefitted both the debtors and their children.

2. Corinne Dale Koehl also uses the name of Corin Dale Koehl.

18. Douglas testified consistently as did Robert Koehl that the purpose of setting up the Louisiana Land Trust was to buy and hold the family property in a format that would operate in a manner similar to a partnership, but would be in the form of a trust. (Ex. 26, pp. 27–29). In this manner, the property would remain in the family, and would go to all of the children, while at the same time, could be used to raise money for the debtors. (*Id.*)

19. By separate acts of sale also dated October 3, 1988, the debtors transferred certain real properties to the Louisiana Land Trust, as follows:

| Transferor(s) | Property Location | Purchase Price |
|---|---|---|
| Clarence Koehl | Chef Menteur, Lot 34 | $15,000.00 |
| Both debtors | Lots on Rosa Ave. | 45,000.00 |
| Both debtors | Williams Blvd. | 25,000.00 |
| Corinne Koehl | Chef Menteur, Lot 87 | 8,000.00 |

(Ex. 8, 9, 10, and 14) (Pl. 6, Uncontested Material Fact # 9). The sale documents indicate that one-half of the price was payable at the closing, and one-half would be due on October 1, 1989. (Ex. 8, 9, 10, and 14). The debtors also sold other properties to the Louisiana Land Trust at that time, including properties located at Country Club Estates, Florida Ave., and Kentucky Ave.

20. Robert Koehl testified that the Louisiana Land Trust paid the one-half of the price due at the closing within one or two months of the closing. Checks introduced into evidence indicate these amounts were paid on various dates in December, 1988. (Ex. 25–1—25–11).

21. Although the transfers of the four pieces of property itemized in Finding of Fact # 19 took place on October 3, 1988, the acts of sale were not recorded until the following dates:

Chef Menteur deed (lot 34)    October 22, 1991
Rosa Ave. deed    October 18, 1991
Williams Blvd. deed    October 18, 1991
Chef Menteur deed (lot 87)    October 18, 1991

(Pl. 6, Uncontested Material Fact # 10).

22. Douglas, the attorney who prepared the trust instruments and the acts of sale, testified that the acts of sale were not recorded contemporaneously with the sale because he "dropped the ball". (Ex. 26, p. 19).

He stated that he forgot to order it done, and "it fell through the crack". (*Id.*) He further testified that the matter was discovered in the fall of 1991 when Robert Koehl was trying to sell or transfer one of the properties. (Ex. 26, p. 20).

### D. *The Life of Georgia Judgment*

23. On September 2, 1988, Life Insurance Company of Georgia ("Life of Georgia") obtained a default judgment in the case entitled *"Life Insurance Company of Georgia v. Lilly, Inc. and C.G. Koehl, Individually"*, Eastern District of Louisiana, No. 88–1037(L)(4), against Lilly, Inc.[3] and C.G. Koehl, individually, in the principal amount of $1,932,076.21 with interest and costs (the "Life of Georgia judgment"). (Ex. 16). The judgment was recorded on September 12, 1988 in Jefferson Parish and in Orleans Parish. (Pl. 6, Uncontested Material Fact # 19).

24. Robert Koehl testified that at the time the debtors sold the properties to the Louisiana Land Trust, the family did not know about the Life of Georgia judgment, and did not know that it had been recorded. Although C.G. Koehl had hired a lawyer to represent him in the suit by Life of Georgia, the lawyer apparently did not notify the Koehls of a hearing. Thus, a default judgment was entered without any knowledge thereof by the Koehls.

25. Robert Koehl testified that when he learned of recordation of the judgment, he entered into negotiations with the representatives of Life of Georgia to settle the judgment and to obtain a release of the judgment lien. In connection therewith, Life of Georgia obtained appraisals of properties owned by the debtors. The appraisals were made by a qualified M.A.I. appraiser but were only "drive-by" appraisals. The appraiser was instructed to estimate the fair market value of the properties as of August 15, 1990. The properties appraised and the amounts of the appraisals are as follows:

| Property | Appraisal |
|---|---|
| 4817 Taft Drive, Metairie | $250,000.00 |
| 3716–17 Saratoga, Metairie | 125,000.00 |
| Rosa Ave. lots | 45,000.00 |
| Van Trump Street, Gretna | 5,000.00 |
| Florida Avenue, Kenner | 35,000.00 |
| Kentucky Avenue, Kenner | 20,000.00 |
| 7200 Washington Ave., New Orleans | 60,000.00 |
| Venetian Isles lot, New Orleans | 15,000.00 |

---

**3.** Lilly Inc. was a company related to the Moler    Beauty College.

(Pl. 6, Uncontested Material Fact #20). Life of Georgia also prepared a list of the status of the properties that the judgment lien encumbered. (Ex. 22).

26. Life of Georgia released its judgment for a payment of $300,000.00. The compromise agreement relating to this transaction was executed on November 11, 1990, and the transaction was closed on December 14, 1990. (Pl. 6, Uncontested Material Fact #21).

27. Seventy-five thousand dollars of the amount paid to Life of Georgia was obtained by the sale of a residence on Sharon Drive by the debtors and Robert Koehl and his wife, Kathy Tujague Koehl, to another of the debtors' sons, Dale Koehl and his wife. (Ex. 6 and 21). One hundred thousand dollars was obtained from a settlement that Lilly Inc. received in a separate lawsuit with PPG Industries (the "PPG settlement"). The remaining amount was paid by Robert Koehl. Because the Life of Georgia judgment encumbered the property purchased by the Louisiana Land Trust, and the existence of the judgment was unknown at the time of the purchase, the remaining one-half of the purchase price owed by the debtors' children to the debtors for the property in the Louisiana Land Trust was not paid.

E. *Moler Beauty College*

28. By the middle or late 1960's, the debtor Corinne Koehl had acquired one hundred percent ownership of Moler Beauty College, Inc. (Pl. 6, Uncontested Material Fact #11).

29. Robert Koehl began working for Moler Beauty College approximately twenty-six years ago when he was still in high school. His involvement in running Moler Beauty College increased over the years. He stated that in 1988 Moler Beauty College experienced a substantial decline in student enrollment.

30. In 1988, Corinne Koehl transferred ownership of Moler Beauty College to Robert Koehl by selling him the stock of Corinne Koehl, Inc. for approximately $1,000. (Pl. 6, Uncontested Material Fact #12).

31. By instrument dated February 17, 1989, the debtors transferred property at Gayoso and Canal Streets to Moler Beauty College, Inc. (Ex. 11). (Pl. 6, Uncontested Material Fact #13). The sale was for a cash payment of $216,000, subject to a mortgage in the amount of $372,743.00, for a total amount of $588,743.00. (Ex. 11). Robert Koehl testified that the property had been appraised at $335,000.

F. *First National Bank of Jefferson*

32. At the time the settlement was entered into with Life of Georgia, Robert Koehl approached the First National Bank of Jefferson ("FNJ") as part of the workout of the debtors' financial difficulties, and offered to purchase the properties owned by the debtors on which FNJ held mortgages. Robert Koehl testified that, according to the appraisals, the properties had no equity, and/or were operating with negative cash flow, and the properties were at a negative value when the outstanding property taxes were included. He stated that because C.G. Koehl had nothing left after the Life of Georgia settlement, FNJ felt more comfortable with his taking over the loans. His applications to take over the loans were approved by FNJ in January or February, 1991. He stated that the actual transfers did not take place until six months later, due to delay on FNJ's part.

33. The parties stipulated to the testimony of Bob Tusca ("Tusca"), an employee of FNJ. Tusca testified that Robert Koehl applied to the FNJ in the latter part of 1990 to have certain properties owned by C.G. Koehl, Inc. transferred to himself. FNJ was in favor of the transfer because the son was in a better financial position than the father, and the loans to C.G. Koehl, Inc. had been paid late consistently since 1987. As a result, Robert Koehl's applications were approved by the FNJ. Tusca further testified that Exhibit 27 shows the loan amounts owed to FNJ as of 10/3/88 and as of 10/18/91, and the values of the properties concerned.

34. As part of the workout with FNJ, the debtors transferred a house on Edenborn Avenue to Robert Koehl on August 14, 1991 for $385,000.00. (Ex. 17). Outstanding property taxes were owed at the time of the sale. (Ex. 17-1). This house was later sold

on July 13, 1992, to Sandra Peterson and Gary Young for $285,000. (Ex. 23).

35. As part of the workout, the debtors also transferred property located at 59 Westbank Expressway to Robert Koehl on August 14, 1991 for a sale price of $390,747.00. (Ex. 20). Robert Koehl testified that the property had a loan value of $210,000 to $215,000, and the approximate value of the property was 215,000 to $220,000. An appraisal requested by FNJ indicated the market value was $215,000.00 as of May 15, 1991. (Ex. 23–1).

36. Robert Koehl also acquired five warehouses on St. George St. on August 14, 1991 as part of the workout with FNJ. This transaction was completed in two separate sale documents, one with a sale price of $282,691.00, and one for $271,733.00, for a total amount of $554,424.00. (Ex. 18 & 19). Outstanding property taxes were owed on the properties at the time of the sale. (Ex. 18–1, 18–2, 18–3, 19–1, 19–2). Robert Koehl testified that the total indebtedness on the properties was approximately $560,000. An appraisal done for the FNJ valued the properties at $541,500 (Ex. 24). Robert Koehl obtained three appraisals from the New Orleans Aviation Board which listed a fair market value for the properties of $484,000.00.

37. As part of the transaction with FNJ, the debtors transferred a vacant lot in LaPlace, in St. John the Baptist Parish to the C.G. Koehl Trust for $7,125.00, subject to the mortgage. (Ex. 5).

38. Based upon the testimony of Robert Koehl, Bob Tusca, and a review of the applicable exhibits, including Exhibit 27, the Court finds that the properties transferred from C.G. Koehl, Inc. to Robert Koehl as part of the workout with the FNJ were for a fair value.

39. Neither the Koehls nor their CPA, believed that the federal taxes were due and owing. The debtors believed the tax returns were correctly prepared. Mr. West did not agree with the bank deposit method used by the IRS to make the assessments against the debtors. Mr. West advised the debtors to protest the taxes. The debtors did protest the proposed assessments. The Court finds

there is no credible evidence of knowledge of falsity of the returns.

40. The Court further finds that the testimony of Robert Koehl, C.G. Koehl, Jay West, and R. Travis Douglas is credible.

*LEGAL ANALYSIS AND CONCLUSIONS*

The debtors seek a discharge of their federal income taxes for the years 1978 through 1983. The United States objects to the discharge under 11 U.S.C. § 523(a)(1)(C).

Section 523(a)(1)(C) provides:

A discharge under ... this title does not discharge a debtor from any debt—

(1) for a tax or a customs duty—

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

Section 523(a)(1)(C) provides two alternative grounds for which a tax liability may be declared nondischargeable, i.e., (1) when the debtor filed a fraudulent return; or (2) when the debtor willfully attempted in any manner to evade or defeat such tax. *In re Lilley,* 152 B.R. 715 (Bankr.E.D.Pa.1993); *In re Hopkins,* 133 B.R. 102, 105–106 (Bankr. N.D.Ohio 1991).

In the present case, the debtors believed that the returns were prepared correctly, based upon the advice of their accountant, Jay West. The United States has not produced any evidence which suggests that the returns were fraudulently filed, and does not assert such an argument in its post-trial memorandum. Instead, the United States seeks to except the taxes from discharge on the second ground, i.e. that the debtors willfully attempted to evade or defeat the taxes.

An exception to discharge under Section 523(a) must be proved by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The burden of proving that the debtor's tax liabilities are nondischargeable is on the United States. *In re Lilley,* 152 B.R. at 720; *In re Fernandez,* 112 B.R. 888 (Bankr. N.D.Ohio 1990); *In re Kirk,* 98 B.R. 51 (Bankr.M.D.Fla.1989).

The meaning of Section 523(a)(1)(C) has been subject to differing interpretations. The case of *In re Gathwright*, 102 B.R. 211 (Bankr.D.Ore.1989), held that Section 523(a)(1)(C) does not include willful attempts to evade or defeat "payment" as a basis for nondischargeability. Although the reasoning used in *Gathwright* was initially followed by some bankruptcy courts, at least two of these decisions were reversed by higher courts. *See Toti v. United States*, 141 B.R. 126 (Bankr.E.D.Mich.1992), *reversed*, *United States v. Toti*, 149 B.R. 829 (E.D.Mich.1993); *Peterson v. Commissioner*, 132 B.R. 68 (Bankr.D.Wyo.1991), *reversed*, *In re Peterson*, 152 B.R. 329 (D.Wyo.1993).

Many courts have rejected the reasoning of *Gathwright*, and have applied the better view that willful attempts to evade or defeat the collection or payment of taxes prevents such taxes from being dischargeable under Section 523(a)(1)(C). Thus, the Court in *In re Jones*, 116 B.R. 810, 814 (Bankr.D.Kan. 1990), held that the phrase, " 'in any manner' is sufficiently broad to include willful attempts to evade taxes by concealing assets to protect them from execution or attachment". Most other cases have also held that attempts to evade or defeat collection or payment of a tax, renders the tax debt nondischargeable under Section 523(a)(1)(C). *In re Sumpter*, 136 B.R. 690, 701 (Bankr.E.D.Mich. 1991); *In re Sells*, 92–1 U.S.Tax.Cas. ¶ 50070, 1991 WL 328039 (D.Colo.1991). The Fifth Circuit has not ruled on the issue.

This Court need not resolve the conflict because the United States has failed to prove that the debtors willfully attempted to evade or defeat payment of the taxes.

■ The traditional "badges of fraud" are frequently considered in analyzing whether intent to defraud exists. The "badges of fraud" are as follows: (1) a transfer made to a member of the family; (2) a transfer made at a time when a large liability was fixed, about to become fixed, or about to be collected; (3) a transfer for little or no consideration; (4) a transfer made when the debtor was insolvent or which rendered the debtor insolvent; (5) a transfer in which the debtor retained concealed control over the asset; and (6) the debtor engaged in other questionable practices during the same time period. *In re Sumpter*, 136 B.R. at 701.

■ The United States in this case relies upon the badges of fraud, and specifically argues that the debtors' intent to evade or defeat payment of their tax obligations is shown by the following acts: (1) sudden transfer of long-held assets; (2) transfers of assets to family members; (3) transfer for less than fair consideration; (4) transfers in the face of claims by creditors; (5) proceeds of the PPG settlement were used for the benefit of the children; and (6) delay in payment to the debtors. An analysis of these factors results in the conclusion that the United States has failed to meet its burden of proof.

The United States failed to prove a "sudden transfer of long-held assets". Although the trusts were formed, and some transactions occurred in October, 1988, the evidence suggests that the transfers were made for valid reasons, i.e. estate planning and to raise money to pay off creditors. While the debtors did transfer property to their son, Robert Koehl, and to trusts in which their children were beneficiaries, they did so for adequate consideration. There is no indication that the debtors made the transfers for less than fair consideration. To the contrary, the uncontroverted testimony at trial was that the transfers were made at fair market value. In addition, the existence of the Life of Georgia judgment encumbering the properties was discovered after the transfers, thus explaining the failure to pay the one-half of the recited consideration that was due within one year of the transfers. Finally, no evidence was introduced which suggested that the debtors used the trusts as their alter ego by maintaining concealed control over the properties.

Neither were the transfers clearly in the face of impending tax debts. The transfers were made at a time when the debtors were undergoing an audit or contesting a tax liability. Although West received the 30 day letter in close proximity to the transfers in October, 1988, the preponderance of the evidence indicates that the 30 day letter was received after the transfers. Further, the

debtors' CPA, West, believed the assessment was in error, and advised the debtors to contest it. The debtors did contest the taxes at that time, and only agreed to the assessments in October, 1991. The evidence shows that the debtors needed cash in October, 1988 to pay other outstanding debts, but does not show that the transfers were made to evade or defeat payment of taxes.

The Court finds that the delay in payment of the consideration for the transfers, approximately two months from October, 1988, until December, 1988 when payment was made to the debtors, is not significant. Further, the debtors have adequately explained the suspicious-looking delay in recordation of the acts of sale by the testimony of R. Travis Douglas, who admitted that the delay occurred because of his error—it "slipped through the crack".

The Court further disagrees with the argument made by the United States that the PPG settlement proceeds of $100,000 were used for the benefit of the debtors' children. It is true that the PPG settlement proceeds were used to pay off part of the Life of Georgia judgment. The evidence adduced regarding this matter is scant. Considering the entirety of the evidence, however, this use of the PPG settlement proceeds does not result in a conclusion of willful attempt by the debtors to evade taxes. The Life of Georgia judgment against C.G. Koehl was in the principal amount of $1,932.076.21, and was far in excess of the $300,000.00 for which Life of Georgia eventually settled. The debtors' poor financial condition was certainly a factor considered by Life of Georgia in accepting a settlement at such a large discount from the amount of the judgment. However, the existence of the Life of Georgia judgment was not known at the time the transfers were made to the Louisiana Land Trust. The debtor's children had paid a fair value for transfer of the properties to the Louisiana Land Trust, only to find that the Life of Georgia judgment encumbered the properties. This was an unexpected and unwelcome event. The PPG settlement proceeds may have technically belonged to a company owned by Corinne Koehl, but use of the money to settle the Life of Georgia judgment was to the debtors' benefit in obtaining the release of such a large judgment on the property then owned or acquired in the future.

Judgment will be entered in accordance with this memorandum opinion.

### JUDGMENT

For the reasons assigned in the foregoing memorandum opinion, accordingly,

IT IS ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of the plaintiffs, Clarence George Koehl and Corinne Dale Koehl, and against the defendant, United States of America.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the debts owed by Clarence George Koehl and Corinne Dale Koehl to the United States of America for the taxes, interest, and penalties assessed arising from the tax years 1978, 1979, 1980, 1981, 1982, and 1983 be and they hereby are determined DISCHARGEABLE.