In re Daniel P. PARKER, Debtor.

Daniel P. PARKER, Plaintiff,

v.

UNITED STATES of America, Defendant.

Bankruptcy No. 93BK–30569.
Adv. No. 95AP–3015.

United States Bankruptcy Court,
W.D. Louisiana,
Monroe Division.

March 8, 1996.

Carl E. Cooper, Monroe, LA, for Debtor.

Neal I. Fowler, Counsel for USA/IRS, Department of Justice, Washington, DC, for defendant.

## REASONS FOR DECISION

HENLEY A. HUNTER, Chief Judge.

This matter comes before the Court on Debtor's complaint to determine the dischargeability of taxes due the United States of America and for damages. The Plaintiff alternatively seeks a determination of nondischargeability and injunctive relief. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incor-

porated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these reasons, there will be judgment in favor of the defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Procedural History

Daniel P. Parker ("Parker" or "Debtor") filed a voluntary petition under Chapter 13 on June 23, 1993. On July 16, 1993, he filed a Complaint against the United States of America, Internal Revenue Service ("IRS") under Adversary Proceeding No. 93–3015, concerning the dischargeability of various tax obligations. On November 18, 1993, Parker's Chapter 13 case was converted to a case under Chapter 7 on motion of the Debtor. On February 17, 1994, Adversary Proceeding No. 93–3015 was dismissed on motion of the Debtor. Debtor received his discharge under Chapter 7 on April 13, 1994. No objections to the discharge under § 727 were filed. This adversary proceeding was filed on May 17, 1994.

Debtor's tax returns were filed as follows:

| YEAR | DATE FILED | GROSS INCOME | TAX RETURN |
|------|-----------|--------------|------------|
| 1980 | 10–26–84 | $ 6,871 | $ 1,137 |
| 1981 | 10–26–84 | 20,749 | 5,679 |
| 1982 | 10–22–84 | 15,606 | 3,703 |
| 1983 | 10–22–84 | 26,339 | 7,396 |
| 1984 | 2–15–91 | 31,569 | 9,919 |
| 1985 | 2–15–91 | 34,739 | 10,996 |
| 1986 | 2–15–91 | 35,246 | 9,772 |
| 1987 | 2–15–91 | 66,666 | 22,788 |
| 1988 | 8–15–89 | 32,550 | 9,763 |

Trial Brief of the United States, filed Feb. 5, 1996; *see also* Exhibits D1–10.

On February 15, 1991, in Criminal Case No. 91–50111–01, Debtor entered a guilty plea to a two-count bill of information alleging failure to file federal income tax returns for the calendar years 1986 and 1987. Debtor subsequently pled to a misdemeanor count. As a condition of his probation, Debtor was required to file returns and pay his tax liabilities for the 1980 through 1988 tax years.

### B. Contentions of the Parties

Debtor asserts that collection efforts taken by the IRS violate the discharge injunction of 11 U.S.C. § 524. Debtor seeks to have his tax debts declared discharged and the IRS enjoined from further collection efforts. Alternatively, Debtor seeks sanctions and attorneys fees. He further alleges that the circumstances surrounding the dismissal of the prior adversary proceeding constitute both equitable and legal estoppel against the IRS.

The IRS maintains that Debtor's tax liabilities for tax years 1980 through 1988 are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C) on the grounds that he willfully attempted to evade or defeat the tax liabilities at issue. Thus, the IRS maintains that the general discharge of the Debtor did not bar its collection efforts. The IRS further maintains that since it has no affirmative duty to bring a § 523 action, the burden of demonstrating the dischargeability of those debts is on the Debtor.[1] Therefore, until there is an order deeming debts under § 523(a)(1) to be discharged, there can be no violation of the post-discharge injunction. The IRS also asserts that the doctrine of sovereign immunity prohibits imposition of damages against the United States since

---

1. The IRS acknowledges that the burden is on creditors whose debts may be excepted from discharge under the so-called fraud exceptions to the discharge under § 523(a)(2), (4), and (6) to file timely complaints under F.R.B.P. 4007(b).

§ 524(a)(2) does not disclose congressional intent to create a substantive claim for damages, attorney fees, or costs. *See* 11 U.S.C. § 106. Finally, the IRS maintains that not only is there no factual basis for Parker's estoppel claim, but also that Debtor cannot satisfy the required elements of proof for traditional estoppel, much less the more stringent requirements of estoppel against the government.

## C. Applicable Law

Section 523(a)(1) excepts from the discharge certain tax liabilities under § 727. This exception includes certain taxes as described in § 707 "with respect to which the debtor ... willfully attempted in any manner to evade or defeat [a] tax." The central issues in this action turn upon a determination of whether the Debtor's conduct constitutes willful acts of evasion.

In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court determined that the burden of proof in dischargeability determinations is a preponderance of the evidence. In so doing, it observed:

The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud. Requiring the creditor to establish by a preponderance of

the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests.

498 U.S. at 287, 111 S.Ct. at 659.

■■■ Parker has the burden of proof on estoppel and damages. But, contrary to the contentions of the IRS, the government bears the burden of proof in establishing that there has been a willful attempt to evade or defeat taxes to except such liabilities from the discharge under § 523(a)(1)(C). *Matter of Bruner*, 55 F.3d 195 (5th Cir.1995).[2] In *Bruner*, the bankruptcy court followed a three part test to determine the dischargeability of tax debts. When a debtor is financially able to pay taxes but does not, the test under § 523(a)(1)(C) is whether (1) the debtor had a duty to pay under the law; (2) the debtor knew he had such a duty; and (3) the debtor voluntarily and intentionally violated that duty. The Fifth Circuit affirmed the holding of the bankruptcy court, thus adopting the test for "civil willfulness" enunciated in various courts, including *U.S. v. Toti*, 149 B.R. 829 (Bankr.E.D.Mich.1993), *affirmed*, 24 F.3d 806 (6th Cir.1994).[3] In adopting the reasoning expressed in *Toti*, the Fifth Circuit squarely asserted that § 523(a)(1)(C) "surely encompasses both acts of commission as well as culpable *omissions*." 55 F.3d at 200 (emphasis in original).[4]

In *Bruner*, the Fifth Circuit declined debtors' invitation, premised upon *In re Gathwright*, 102 B.R. 211 (Bankr.D.Or.1989), to require an affirmative act to bar the discharge. The debtors in *Bruner* argued that "if mere non-payment is construed to constitute willful evasion under § 523(a)(1)(C), then all taxes will be non-dischargeable." 55 F.2d at 198. This Court notes that the Fifth Circuit did not, however, in its words, "squarely resolve the affirmative act argument forwarded by the Bruners based on *Gathwright*." 55 F.3d 195, at 200. The

---

**2.** *See also In re Koehl*, 166 B.R. 74, 79 (Bankr. E.D.La.1993).

**3.** Several courts have similarly held that the definition of "willfully attempted to evade" equates "willful" with "voluntary, conscious, and intentional evasions of tax liabilities." *In re Toti*, 24 F.3d at 809 (citing *Collins v. United States*, 848 F.2d 740, 742 (6th Cir.1988); *Domanus v. United*

States, 961 F.2d 1323, 1326 (7th Cir.1992)); *see also In re Ketchum*, 177 B.R. 628, 630 (Bankr. E.D.Mo.1995) ("[I]n cases of civil tax fraud, 'willfulness' simply means a voluntary, intentional violation of a known legal duty.")

**4.** *See also In re Goff*, 180 B.R. 193, 198 (Bankr. W.D.Tenn.1995).

Fifth Circuit also rejected the approach taken by the Eleventh Circuit in *In re Haas*, 173 B.R. 756 (S.D.Ala.1993), *reversed*, 48 F.3d 1153 (11th Cir.1995). In *Haas*, the Eleventh Circuit rejected the approach adopted in *Toti* and held that the language of § 523(a)(1)(C) should be interpreted consistently with the criminal provisions of the Internal Revenue Code to require a willful act of evasion. 48 F.3d at 1155–57.[5] Conversely, the Fifth Circuit noted that the evasive conduct of the Bruners more closely resembled the conduct of the debtor in *Toti* than in *Haas*. The debtors in *Bruner* and in *Haas* had avoided payment until criminal sanctions were threatened and neither paid their full obligations. The Bruners, the Fifth Circuit observed, had avoided even the assessment of taxes:

> They engaged in a pattern of failing to report income, failing to file tax returns, and failure to pay taxes. Moreover, they apparently conducted an inordinate number of cash transactions and even created a shell essentially designed to conceal their income and assets. The Bruners were engaged in both acts of omission and acts of commission, all designed to willfully evade the imposition of taxes against them. This is not a case of "mere" non-payment like that in *Haas*. Thus, we need not squarely resolve the "affirmative act" argument forwarded by the Bruners, because the Bruners did engage in affirmative acts designed to evade their tax liabilities.

55 F.3d at 200.

*In re Fuller*, 189 B.R. 352 (W.D.Pa.1995), the District Court discussed the various circuit level holdings on this issue as well as the holding of the Third Circuit in *Quattrone Accountants Inc. v. Internal Revenue Service*, 895 F.2d 921 (3d Cir.1990). In *Quattrone Accountants*, the Third Circuit examined the willfulness requirement in the context of failing to pay withholding taxes. It held that "willfulness" in the context of a penalty under I.R.C. § 6672 required "a voluntary, conscious and intentional desire to prefer other creditors over the government." At least one bankruptcy court in that circuit

had applied the same definition of willfulness to § 523(a)(1). Noting that the delinquent taxpayer filed his returns only when an IRS agent threatened criminal prosecution, the Third Circuit chose to follow *Haas* rather than *Bruner*, and held for the taxpayer. A number of factors, including Fuller's age, health and impecunious circumstances (disability payments were his only source of income) militated strongly in debtor's favor.

In *In re Wright*, 191 B.R. 291 (S.D.N.Y. 1995), the District Court affirmed the findings of the bankruptcy court and held that the debtor's tax obligations were nondischargeable. Wright was an anesthesiologist who expended heavily to send his children to Ivy League schools, paid substantial credit card charges for his spouse and child, traveled extensively, supported his brother and sent checks to his mother. The Bankruptcy Court noted that Wright "did not simply passively ignore his tax liability. Wright also committed affirmative acts of tax avoidance." 191 B.R. at 293. After the IRS imposed a tax levy, Wright formed a professional service corporation to receive payments, which the court labeled an affirmative act of tax avoidance. He did not maintain a personal checking account because of a prior levy. The District Court reviewed the holding of the bankruptcy court, which (despite expressing sympathy for Wright and praising his commitment to his family's support) held the obligations nondischargeable. The District Court based its findings upon the holding in *Bruner*, disagreeing with the reasoning in *Haas* and *Gathwright*.

## SUMMARY OF THE EVIDENCE

### A. Background

Daniel Parker was born in 1950 and is an attorney-at-law, having obtained a Juris Doctor degree from LSU in 1976. He then entered military service, serving as a Lieutenant in Military Intelligence. He filed tax returns for the years he was a student and in the military. After admission to the Louisiana Bar Association in 1979, he practiced briefly with another attorney in Baton

---

**5.** *See also In re Fuller*, 189 B.R. 352, 356 (Bankr. W.D.Pa.1995) ("The mere failure to pay tax obligations does not amount to a voluntary conscious or intentional attempt to evade taxes ...")

Rouge, Louisiana. Shortly thereafter, he relocated to Monroe, Louisiana where he associated with Ned Wright.

### 1. *The Wright Firm*

By the time of his professional association with Parker, Ned Wright had established a successful personal injury practice. In addition to Parker, other attorneys were similarly affiliated with Wright, including Jay Nolen, "Buddy" Lofton and Chester Bradley. The firm was generally known as "Wright and Associates," although it apparently operated as "Wright and Parker" or other names from time to time. *See* Exhibits D 17–20.

Although the associates held themselves out as sole practitioners, each lawyer had an arrangement with Wright that the latter would be responsible for all expenses of the firm, including any overhead or expenses incurred in litigation. If Wright referred a case to an associate for handling, the "split" was 60/40 of any recovery; if an associate brought the business to the firm, the "split" was 50/50. Similar fee sharing arrangements were common in the community.

Despite the nomenclature on the bank accounts, Wright retained authority for their maintenance. Various bookkeepers or other employees were responsible for maintaining records of draws made payable to the associates. None of the associates were authorized to sign checks. If an associate was responsible for bringing in a case, his or her initials were placed first on the file folder; otherwise, Wright's name was placed first. This method insured that earnings were properly posted to the firm records.

Draws were issued on the 1st and 15th of each month. Bradley recalls calling these dates "pay zones" rather than "pay days" due to the periodic insufficiency of funds on hand. He went to the IRS and obtained the necessary forms to file self-employment taxes. He does not recall receiving a 1099, K–1, or any other document or form reflecting his earnings from the firm, except perhaps for a

brief period of time prior to passing the bar when he was employed as a paralegal. The firm made no withholding for taxes and each attorney was responsible for keeping records for his draws for tax purposes.

Despite the firm's unconventional payroll procedures, the attorneys' collective practice was very successful. This is not to say that there were not lean periods during which the associates draws were deferred, but ultimately paid.[6] Parker's association with Wright continued until October of 1988, when Wright died in a tragic automobile accident.

### 2. *Parker's Individual Finances*

Parker purchased a condominium from Ned Wright in May 1984 for $62,000. He financed the purchase through Troy & Nichols, mortgaging it for $55,000. Exh. D–12. Parker subsequently approached Jay Nolen about the possibility of obtaining a loan secured by the condominium. Although he did not obtain a formal appraisal, Nolen declined to advance the funds after determining from his review of the tax assessor's records that there was no equity in the condominium.

Nolen suggested that Parker establish a collateral mortgage (used in Louisiana to secure future advances) to facilitate the borrowing effort. Collateral mortgages involve the execution of a collateral mortgage and a collateral mortgage note. The mortgage is recorded in the public records which does not take effect unless funds are advanced against the mortgage. When a loan is advanced, a "hand note" is executed together with an agreement which "pledges" the collateral mortgage note to secure the hand note. Subsequent advances may be made at the election of the borrower, up to the value of the mortgaged collateral.[7] Since the public documents reflect a mortgage to a "Future Holder" (sometimes "Bearer"), ascertaining the identity of the holder of the note or if there have been advances can be difficult.

Nolen's practice is heavily oriented toward real estate. He recalled Parker's unfamiliar-

---

6. In fact, four checks payable to or on behalf of Parker were returned "NSF." *See* Exh. D–17, check # 3596 dated January 31, 1984; check # 4169 dated August 1, 1994; Exh. D–19, check # 3216 dated October 30, 1986, and check # 3600 dated February 3, 1987.

7. Collateral mortgages also involve intricate rules of ranking depending on the date of the advance as opposed to the recordation date of a competing lien creditor.

ity with the collateral mortgage device, but did not recall Parker explaining the need for the loan. Another attorney, Lee Ineichin, appeared in the mortgage document as the nominal "acceptor" of the mortgage. Exh. D–12. The documents were signed at an office where Ineichen practiced. He apparently walked by at a convenient time and was asked to be the "acceptor." He recalled some vague reference by Parker to a conversation with a CPA. Ineichen was himself unfamiliar with this common security device. Moreover, he was anxious to avoid any transaction involving Wright, whom he did not trust. Exh. D–40. Nolen believes that Parker indicated he would ask Wright to loan him the money. Even during law school, Wright frequently made personal loans to Parker, which, according to Nolen, were repaid.

Nolen explained that a commercial lender would normally require that this type of loan be prepared on its own forms, but a private lender may not. A title opinion is usually furnished to commercial lenders, but some lenders obtain only a mortgage certificate. He did not prepare an opinion in this transaction.

Wright leased a Honda vehicle for a female acquaintance in 1984. Exh. D–13. A bookkeeper, apparently unaware of this arrangement and assuming the vehicle had been leased for Bradley, asked him how the bill was to be handled. Bradley explained he knew nothing about the lease. Wright subsequently asked Bradley to assume the lease, with the lease payments to be taken out of Bradley's draw. Bradley declined, preferring to drive his much older vehicle until he could buy a new vehicle for his spouse, who had supported him during law school. Parker then took over the lease payments, since his old car had been wrecked a "couple of times." Until the end of 1987, Parker regularly made lease payments, which were frequently deducted from his draw. Exh. D–13. Parker exercised the purchase option at the end of the lease period in 1987, but title to the vehicle was not transferred to Parker until well after Wright's death, perhaps two years later. Bradley speculated that Wright continued to hold title to the vehicle because

Parker owed him money. Tr. p. 60. Parker explains that the need to transfer the title just "did not come up."

Parker had a personal checking account only briefly. Afterwards, many of his personal expenses were paid by firm check. Exh. D 17–20. From 1984 through 1987, the firm paid many of Parker's personal expenses, including his bar dues, payments on the leased vehicle, education costs for Parker, payments on an American Express account or payments on his mortgage. These expenses were deducted from the amount of his draws.

Parker also had an American Express credit card, although he shared the account with Ned Wright. Wright obtained the primary "Corporate Card" and asked Parker if he would like his own card. The American Express account records for the period February 1986 through early 1988 reflect that Parker charged numerous restaurant and bar expenses to the card. Wright and Parker's charges were listed separately on each monthly bill. Parker's charges include expenses incurred in connection with a trip to Washington, D.C. in January 1986 and for a trip to Hawaii in October 1987.

### 3. *Tax Problems*

Parker was a longtime friend of a Joe Erwin and in fact represented Mr. Erwin in a bankruptcy proceeding. There were tax problems in the Erwin case. Hooper, Parker and Erwin met to discuss a plan for the § 341 creditors meeting in the latter's case and Parker mentioned to Hooper (apparently out of Erwin's presence, since he had no recollection of the comments) that Parker himself had tax problems. Although Parker only occasionally practiced bankruptcy law, he testified that it was his general understanding that all taxes were non-dischargeable.

Parker set up a number of meetings with Hooper but missed the appointments. Ultimately, Parker met with Hooper and presented the latter with a list of his sources and amounts of his income. Hooper suggested that Parker might be able to deduct business expenses and thereby minimize his tax liabilities. He apparently sent Parker on his

way to bring back business records, although Hooper did not bill Parker for these services.

Ultimately, Parker returned to Hooper's firm. Hooper's son, Gary, prepared returns for the tax years 1984–1987 and sent them to Parker by certified mail in November, 1988. Exh. D–39. The returns were sent by certified mail (an unusual step) to "protect their situation," since they were "requesting information for [Parker's] return." Gary Hooper could not recall any conversations or contact with his father about Parker, including whether or not his father gave him the "source documents." He was unable to explain why the tax returns were not signed by a representative of his office, commenting that this was "odd." He first learned that Parker was under investigation by the IRS in February of 1989. As a general rule, Hooper's firm does not file returns for clients unless they have a check for the taxes "in hand." Parker's returns were not filed until 1991. Parker attributed the delay in filing to his erroneous belief that his counsel in the criminal case had filed the 1984–1987 returns using his power of attorney.

Parker testified that his own complacency in not filing returns was influenced by his perception that other attorneys in the Monroe area, including Wright, did not file regular returns. He recalled that an official with the State of Louisiana, Mr. Frank Serio, called him and threatened a seizure of his income. He made arrangements with that official. He assumed that someone from the IRS would similarly call him as his taxes became deficient. Parker stated he never intended not to pay. Although he took tax courses in law school, Parker described them as "crip" courses. Presently, Parker stated the government has made him a "believer," and he now pays his tax obligations "early and often."

### 4. Personal Problems

By his own admission, Parker had a lifelong substance abuse problem with alcohol and prescription drugs. His co-workers testified at trial and at the sentencing hearing that Parker's conspicuous substance abuse adversely effected both his productivity and his judgement. Tr. p. 55–58. Dr. Clyde E. Elliot, a specialist in addiction medicine and a general practitioner, testified that he first met with Parker on June 1, 1989. Tr. p. 68. Dr. Elliot testified that alcohol and drug addiction "changes the person's behavior from one of a reasonable functioning person to one who is totally unreasonable.... The end product is you see unworkable decisions emanating from the person." Tr. p. 69. These extenuating circumstances unquestionably affected Parker's ability to appreciate the seriousness of his personal and professional obligations.

As of the date of the sentencing, Parker was following directions and making substantial progress in his rehabilitation. In his sentencing order, the Magistrate Judge required participation in a treatment program as a condition of probation. In part due to his continuing progress toward complete rehabilitation, Parker's probation was terminated early by the Magistrate Judge. Exh. D–28.

### 5. IRS Collection Efforts

Mike Pritchard, an IRS agent, testified that he attempted contact with Parker in September 1987. Pritchard left phone messages at Parker's residence which were not returned. Pritchard subsequently checked motor vehicle records and found no vehicle in Parker's name. After checking the public records, Pritchard located Parker's collateral mortgage notes connected with the condominium. Pritchard was aware of Parker's earlier delinquent filings. The IRS filed a tax lien against Parker on July 1, 1985. Exh. D–12(d).

Parker ultimately returned Pritchard's calls and he met with Pritchard at Parker's office on September 14, 1987. Parker advised Pritchard that his personal financial situation had worsened since he had spoken with another IRS agent, a Mr. Kinney. Parker had promised to have financial statements ready for his meeting with Pritchard. Although the statements were not prepared, Parker advised Pritchard that he owed more on the condominium than it was worth, advising him that the walls were "falling down." In fact, Parker joined a group of homeowners who filed a law suit against the contractor in January 1986. Exh. P–1. At his

meeting with Pritchard, Parker offered to give the IRS the condominium in satisfaction of their claims.

Parker and Pritchard set another meeting for September 21. Not only did Parker fail to compile his financial statements as promised, he failed to appear at the meeting. Parker explained that he did not complete the statements because "there was nothing to put on them." Parker told Pritchard he had been working on a case that should be settled by the end of 1987 that would be a source of income. When Parker did not appear for the September 21, 1987 meeting, Pritchard "backed off" and decided to make a criminal referral, making no further attempts to collect.

Mr. Ronald Carter, another IRS agent, compiled the income and expense records from the law firm ledgers and recalled that all necessary records were made available to him. When questioned concerning Parker's sophistication and ability to conceal assets, Carter recalled that Parker had no personal bank account and made payments on a car that was not listed in his name. As he made the audit, however, he had no indication that the amounts shown on the law firm records did not correctly reflect Parker's income.

### 6. *The Criminal Proceeding*

Parker was ultimately prosecuted and entered a plea of guilty to two counts of wilfully failing to file tax returns. Exh. D–29(a). Mr. Brownlee testified at the hearing before the United States Magistrate Judge and acknowledged at that time that he found no attempt to deceive the government apparent from the law firm's records. The law firm's documents comprised the primary basis of the IRS determination of Parker's income and corresponding tax liability. Tr. p. 46–47. Brownlee also recalled that law firm personnel advised him that the Honda vehicle belonged to Parker. Brownlee testified that he was unaware of any attempt to "hide anything" from him. Tr. p. 45. Brownlee posited that the significance of Parker's lack of a personal checking account was to prevent any funds from being levied. A levy on the law firm might not have been successful due to the manner in which Parker was paid. Pritchard described the collateral mortgage

transaction as a "hip pocket" mortgage. "It could show that there is potentially a liability against that property, against the condominium." Tr. p. 11. Pritchard recalled Parker's statement that he owed more on the property than it was worth. He stated that Parker was forthcoming in acknowledging his failure to pay. Tr. p. 17.

### 7. *The Bankruptcy Case*

Parker concedes that the only debts listed in his bankruptcy petition were his debts for taxes. In the original adversary proceeding, the IRS maintained that the dischargeability issue was premature, and should be raised only after payments were completed under his Chapter 13 plan. *See* F.R.B.P. 4007(d). Although Mr. Dan LaGrone was general bankruptcy counsel, Parker obtained the services of Mr. Robert Raley, a Bossier City, Louisiana attorney, to assist in the tax matters. When the first adversary proceeding was dismissed, Parker understood he would owe no more taxes. He recalled Raley calling prior to the dismissal and saying it was his "lucky day"; but when he later received a delinquent tax notice for $170,000, he expressed considerable dissatisfaction to Raley. Consequently, Raley refunded part of the fees Parker had paid him.

Raley testified that at the time of the conversion, the *Bruner* case was proceeding at the trial level in the Shreveport Division of the U.S. Bankruptcy Court. Raley followed that case closely and had frequent discussions with the Bruners' bankruptcy counsel, Mr. Scott Bowie and also with Mr. LaGrone, Parker's general bankruptcy counsel. Raley sensed that Parker's legal position was deteriorating as the Bruner matter progressed. Raley was concerned that the IRS would oppose Parker's discharge under § 727. After pre-trial proceedings in the first adversary proceeding, Raley understood that counsel for the IRS would not pursue a § 727 action if the dischargeability complaint was dismissed. Essentially, Raley knew the IRS "could do what it wanted." He opined, however, that he thought some of the taxes would "abate" on their own; but he did "think" the service would "pursue" the old taxes. The IRS did issue an instruction letter to the Department of Justice not to pur-

sue a § 727 action. Exh. D–36. It also, through its counsel, joined in the dismissal of the § 523 action "without prejudice."

Debtor's present counsel, Mr. Carl Cooper, with whom Parker presently shares a secretary, has been paid a total of $9,000 through the trial date of this proceeding. As payment, Parker has waived receipt of payment by Cooper for the secretary's compensation in the amount of $750 per month. Parker states he was upset and "pretty depressed" when he learned the government would proceed with collection efforts. His preoccupation with this matter has affected his productivity and been "wearing" on him.

## ANALYSIS

■ At the conclusion of the plaintiff's case, counsel for the IRS moved for judgment on partial findings in accordance with F.R.C.P. 52(c), made applicable to this proceeding by F.R.B.P. 7052. That rule permits the court to enter judgment as a "matter of law against [a] party with respect to a claim or defense that cannot under the controlling law be maintained ..." The court, as is its prerogative, declined to render any judgment before the close of the evidence. After careful consideration of the evidence adduced at trial in light of controlling law, this Court now grants defendant's motion.

This Court finds no evidence in support of Parker's estoppel claims. Only unwarranted assumptions by Parker and his Counsel support his contentions that the IRS would not pursue collection efforts. In the dismissal of the first adversary proceeding, the bankruptcy judge's order granted the parties 30 days from January 18, 1994 to

> submit a consent judgment and dismiss without prejudice the remaining issues in this adversary proceeding or request leave of court to file amended pleadings. Failure to take any of these actions and/or request that the matter be re-set for trial within this *second* thirty (30) day period

and this adversary shall be dismissed for failure to prosecute.

Exh. D–35.

Frequently, the IRS is able to reach an agreement with certain debtors concerning the nondischargeability of various taxes. That agreement is then memorialized in a consent judgment. Such an agreement is not present in the instant case. The only agreement reached was an agreement not to object to the discharge under § 727. The dischargeability proceeding was then dismissed without prejudice. Neither Parker nor his counsel had any reason to believe the dismissal without prejudice was anything more than exactly that.[8] In Raley's words, he understood the government could "do whatever it wanted." Therefore, these reasons need not address the IRS defenses to the estoppel claim, or the Debtor's alleged damages.

■ Turning to the dischargeability claim, the IRS conceded in the criminal case and in this matter that it found no irregularities as it reconstructed Parker's income from the Wright law firm records. It argues, however, that Parker's conduct in encumbering his condominium with the collateral mortgage and in paying for the rented vehicle through the law firm and then not promptly obtaining the title (once payments were complete), constitute the same type of "shell" transactions engaged in by the Bruners. These contentions are without merit. The IRS agent here corroborates Parker's immediate willingness to surrender the condominium to the IRS. The only shred of evidence connecting the collateral mortgage to taxes is Lee Ineichen's recollection that Parker mentioned something about a conversation with a CPA. Pritchard appears to have a good layman's understanding of this sophisticated security device and was not deceived by its mere recordation.

Debtor concedes that the auto lease payments were made through the firm. Those payments ceased sometime prior to the

---

8. The date first scheduled for the § 341(a) meeting in the converted case was January 18, 1994. A complaint under § 727 must be filed within 60 days of the date first set for that meeting. F.R.B.P. 4004(a). The adversary proceeding was dismissed on February 18, 1994. Arguably, the IRS, but for its agreement not to file an objection to the discharge under § 727, was not yet time-barred.

transfer of the title to Parker. The transfer of title was consummated only after Wright's death. However, the entire transaction appears to be nothing more than Parker's inattention to such details, a habit doubtless reinforced by his substance abuse problems.

In *Bruner*, debtors (having reported professional income of $243,457 in 1980), made substantial cash payments and deposited funds into an entity they designed as a shell. In the *Wright* case, *supra*, the debtor engaged in similar affirmative acts of tax avoidance, creating a professional service corporation and "not maintaining" a personal bank account because of a prior levy. The Wright Law Firm accounts were in the instant case were scarcely a shell. Parker had no control over the firm's accounts or its bookkeeping methods. Wright's control over the firm and its funds was complete. Parker's charges on the American Express account seem far more indicative of "partying" in support of his addiction than an opulent lifestyle choice intended to prefer other creditors over the IRS. Parker's income is modest indeed when contrasted with that of the Bruners. The Bruners earned over $100,000 each year after 1980, according to "undeniably low-ball amounts based solely upon the money the Service could trace and allocate to [them]." 55 F.3d 195, at n. 5. Nor is the mere fact that the Debtor once went to Washington, D.C., for pleasure and took another vacation in Hawaii, suggestive of an outrageous lifestyle compared to the debtor in *Wright*, *supra*. Parker is scarcely the impecunious debtor in *Fuller*. To the extent that he "partied," he did so in the grasp of an addiction.

Yet, even though Parker's conduct does not rise to the egregious levels of evasion demonstrated in *Bruner*, that case requires *only* that the IRS satisfy a three prong test, *supra*. Parker concedes here the first prong of that test, the duty to file. On the second prong, Debtor must know he had the duty. Parker filed his tax returns each year he was in law school and throughout his years of military service. His disingenuous statements that he took three "crip" tax courses in law school, his fallacious assumption that someone from the IRS would call him to inform him of his outstanding obligations and his assertion that it was the practice of other lawyers in the community not to file, simply do not avail him. On the next and final prong, the Debtor must have voluntarily and intentionally violated the duty. It is clear that Parker failed to file his tax returns and made payments for 1984–1988 only after the IRS commenced a criminal investigation. These are acts of *omission* as well as *commission*. The evidence clearly preponderates in favor of the IRS and against Parker under the *Bruner* analysis.

Were this Court required to find that Parker committed an *affirmative* act of willful evasion to bar the discharge, this Court would construe the evidence against the IRS.[9] Unlike the debtors in *Bruner* and *Wright*, Parker is a model of passive behavior. This Court is not persuaded that the collateral mortgage transaction and the vehicle lease constituted, either individually or collectively a deliberate scheme of tax avoidance. Nor has the IRS shown any inferences to be drawn from either Parker's closure of his personal checking account or the subsequent absence of such an account (unlike debtor in *Wright* who *affirmatively* did not maintain an account to avoid a levy). From all appearances, the firm credit card and payments made on Parker's personal debts from the Wright firm accounts made a personal checking account unnecessary. The U.S. Magistrate Judge by an order entered July 1, 1994, terminated Parker's probation. Exh. D–28. In doing so, the Magistrate Judge noted that "Mr. Parker has been making a genuine effort to rehabilitate himself while paying the penalty that must be paid by a person who failed to comply with our country's laws over a period of time." This Court is also impressed with Mr. Parker's rehabilitation. There is much to support a conclusion here that the IRS has already extracted its full measure of justice. All the

9. This Court does not agree with the conclusion of the U.S. Magistrate Judge at the sentencing hearing that there was "some indication from the evidence that there was some scheme on the part of Mr. Parker to at least make things ... not obvious to the government...." Exh. D. 29–(b) at 5.

IRS has shown is Parker's failure to file and his failure to pay when such was his duty. This Court is troubled by the result in *Bruner* which appears to shift an insurmountable burden to the taxpayer. But, constrained as it is by *Bruner*, this Court is compelled to render judgment for the defendant.

### CONCLUSION

Pursuant to these reasons, there will be judgment in favor of the defendant dismissing the demands of the plaintiff. There will be further judgment in favor of the defendant and against the plaintiff, decreeing the obligations of the Debtor to the IRS nondischargeable. A separate and conforming order will enter.